SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-05-0507-AP |
| Appellee, | ) | |
| | ) | Pima County |
| v. | ) | Superior Court |
| | ) | No. CR20031993 |
| CODY JAMES MARTINEZ, | ) | |
| | ) | |
| Appellant. | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

Appeal from the Superior Court in Pima County
The Honorable Howard L. Fell, Judge Pro Tempore

**Affirmed**

_____

| | |
|---|---|
| TERRY GODDARD, ARIZONA ATTORNEY GENERAL | Phoenix |
| By   Kent E. Cattani, Chief Counsel, | |
| Capital Litigation Section | |
| Lacey Alexandra Stover Gard, | Tucson |
| Assistant Attorney General | |
| Attorneys for State of Arizona | |
| | |
| LAW OFFICES OF WILLIAMSON & YOUNG P.C. | Tucson |
| By   S. Jonathan Young | |
| Attorneys for Cody James Martinez | |

_____

**R Y A N**, Justice

**I**

**A[1]**

¶1      On June 12, 2003, twenty-one-year-old Cody James

Martinez, fifteen-year-old Michael Lopez, and several other

_____

[1]    We review the facts in the "light most favorable to
sustaining the verdict[s]." *State v. Tucker* (*Tucker I*), 205
Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

adolescents were at a friend's Tucson home smoking marijuana. Johnathon Summey-Montaño arrived with Francisco Aguilar. Aguilar was sent out with two others to purchase rolling papers for the group.

¶2 Summey-Montaño described Aguilar to Martinez as a "baller" (meaning he had money) and suggested that they rob him. Martinez agreed. When Aguilar returned to the house, Martinez first engaged him in a conversation and then punched him in the face. Martinez and Summey-Montaño began beating Aguilar, while other members of the group went outside. Martinez and Summey-Montaño called Aguilar a child molester.[2] Martinez directed Lopez to join in kicking Aguilar, threatening to kill Lopez if he did not do so. Summey-Montaño pointed a shotgun at Aguilar. Martinez took the shotgun and hit Aguilar in the head with it. Martinez and Summey-Montaño then bound Aguilar's hands and feet. Aguilar was crying and begging for an explanation for the beating. Martinez and Summey-Montaño took valuables from Aguilar: Summey-Montaño put on Aguilar's necklace and took two dollars from one of Aguilar's shoes; Martinez put Aguilar's gold bracelet in his own pocket.

¶3 Lopez and Summey-Montaño then forced Aguilar into the trunk of a car. Martinez, Lopez, Summey-Montaño, and at least

---

[2] Martinez claimed that Summey-Montaño had told him that Aguilar had raped Summey-Montaño's eleven-year-old cousin.

one other person got into the car. Martinez drove and Summey-Montaño gave directions to Aguilar's home. When they arrived, Martinez instructed one of the others to watch for Aguilar's family. Martinez and Summey-Montaño entered the house and returned with beer and liquor. Apparently dissatisfied with the haul, Martinez demanded that Aguilar tell him "where's the stuff; where's the shit?" – a reference to "drugs, money, or whatever." Martinez returned to the house and came back with a computer printer.[3]

**¶4** When they tried to leave, Martinez could not start the car. The group pushed the car, with Aguilar still in the trunk, to a nearby gas station. They put gas in the car but it still did not start. The group pushed it to a nearby pay telephone and sat there. Aguilar remained in the trunk.

**¶5** Later, an acquaintance arrived at the gas station. Martinez spoke to this person and showed him a bag of methamphetamine. The acquaintance used Aguilar's mobile telephone to call Fernando Bedoy, who arrived in a Ford Explorer. Using the Explorer, Martinez and the others pushed

---

[3] Martinez was seen with women's jewelry after leaving Aguilar's house. Fritzie Gonzalez, the woman with whom Aguilar lived, told jurors that her house had been "turned upside down." She was missing beer and liquor, a computer printer, jewelry, and jewelry boxes. Gonzalez identified jewelry found on Martinez as including a bracelet she had given Aguilar and other items that belonged to her.

their vehicle to a side street. The car still would not start.

¶6     Summey-Montaño and Martinez then led Aguilar from the trunk of the car to the cargo space of the Explorer, keeping him covered with a blanket. Martinez poked Aguilar with a shotgun when Aguilar did not crawl into the Explorer fast enough.

¶7     Martinez, Bedoy, Lopez, and Summey-Montaño got into the Explorer, leaving the rest of the group behind. Bedoy drove. After some discussion between Summey-Montaño and Martinez, Martinez directed Bedoy to the desert. Martinez announced he intended to kill Aguilar and anyone who tried to stop him.

¶8     As Bedoy drove, Martinez and the others were laughing and taunting Aguilar. Summey-Montaño stabbed Aguilar in the hand with a knife and hit him with a compact disc he claimed to have stolen from Aguilar. He also mocked Aguilar, asking him to name his favorite track on the disc.

¶9     When the group arrived at the desert area, Summey-Montaño pulled Aguilar out of the Explorer. Martinez and Summey-Montaño kicked Aguilar. Aguilar was dragged around the truck, making "noises of pain . . . moaning and groaning." Martinez, Summey-Montaño, and Lopez continued kicking and stomping on Aguilar, while Aguilar begged for his life. Martinez demanded he shut up and ordered Aguilar to march into

4

the desert at gunpoint and then to lie down.

¶10     Martinez fired a shot at Aguilar that went "[r]ight above his head," although Martinez stood directly above the victim.  Martinez laughed about having missed.  As Martinez reloaded the shotgun, Summey-Montaño beat Aguilar with a tire iron and stabbed him in the belly.  Martinez fired again, this time hitting Aguilar in the collarbone area, "[a] little lower than the neck," but not killing him.  Summey-Montaño refused Martinez's request that he finish off Aguilar, so Martinez fired one more time, hitting Aguilar in the neck, killing him.

¶11     Martinez and Summey-Montaño ordered Lopez and Bedoy to wipe out the footprints they had left.  Trash was piled on Aguilar's body and Martinez lit the pile on fire.  The group returned to the Explorer and drove away.

¶12     Moments later, a Tucson Airport Authority police officer on patrol noticed smoke in the distance and the Explorer driving from that direction and initiated a traffic stop.  As the police cruiser and the Explorer crossed paths, Martinez hid cocaine and methamphetamine in the vehicle in which he was travelling.  He told the group to tell police they were coming from a barbeque at "Cisco's."  He told the officer who stopped the Explorer the same.  Police detained the group.  Tucson firefighters, meanwhile, responded to the blaze and reported

that a body had been found.  After the body was discovered, Martinez was taken into custody and, incident to that arrest, was searched.  Jewelry and marijuana were found in Martinez's possession.  Liquor, drugs, and the shotgun were also found in the Explorer.

**B**

¶13     In the fall of 2005, a jury found Martinez guilty of premeditated first degree murder, felony murder, and kidnapping. The sentencing proceedings followed, and at the aggravation phase, the jury unanimously found that Martinez murdered Aguilar for pecuniary gain and committed the slaying in an especially cruel, heinous, and depraved manner.  *See* Ariz. Rev. Stat. ("A.R.S.") section 13-703(F)(5), (F)(6) (Supp. 2003).  At the penalty phase, Martinez put on evidence that he had had a terrible childhood, that he had been molested as a child, and that those circumstances led him to murder Aguilar.  The jury concluded that the mitigation evidence was not sufficiently substantial to call for leniency, determining that Martinez should be sentenced to death.

¶14     An automatic notice of appeal and an appeal from post-trial rulings[4] were filed with this Court under Arizona Rules of

---

[4]     In early 2006, Martinez filed a motion for new trial under Arizona Rule of Criminal Procedure 24.1, raising many of the

Criminal Procedure 26.15 and 31.2(b) and A.R.S. §§ 13-4031, -4033 (2001). We have jurisdiction under the Arizona Constitution, Article 6, Section 5(3), and A.R.S. §§ 13-4031, -4033.

## II

### A

¶15 Martinez first argues that prosecutorial misconduct warrants a new trial. This Court will reverse a conviction for prosecutorial misconduct only when "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying [the] defendant a fair trial." *State v. Velazquez*, 216 Ariz. 300, 311, ¶ 45, 166 P.3d 91, 102 (2007), *cert. denied*, 128 S. Ct. 2078 (2008) (quoting *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 340, ¶ 45, 111 P.3d 369, 382 (2005)). Martinez did not object below to any of the prosecution's allegedly improper statements. Absent a trial objection, we review claims of prosecutorial misconduct for fundamental error. *Id*. at ¶ 47.

¶16 Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State v.*

issues he now advocates on appeal. The superior court denied the motion after a hearing.

7

*Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005) (citation omitted). "To prevail under this standard of review, a defendant must establish both that fundamental error exists and that the error in his case caused him prejudice." *Id*. at ¶ 20 (citation omitted).

**1**

¶17    When the police stopped the Explorer, Martinez and his companions told investigators that they had been at a barbeque at "Cisco's."[5]  The jury heard that this cover story came from Martinez.  In closing arguments at the aggravation phase, the prosecution told jurors that Martinez provided his friends "a sickening excuse to offer up to the police officers – we were at Cisco's barbecue – so he cannot be connected with this crime."

¶18    Martinez claims that the prosecutor knew, based on a series of free talks between the State and other defendants, as well as an interview of Martinez, that the alibi, although a fabrication, was not a "joke" about burning Aguilar because the reference was to another "Cisco."

¶19    A prosecutor is entitled to make arguments supported by the record.  *State v. Hughes*, 193 Ariz. 72, 85, ¶ 59, 969 P.2d 1184, 1197 (1998).  The prosecutor's comment about the alibi was a suggestion that Martinez's reference to "Cisco"

---

[5]    Francisco Aguilar had been called "Cisco."

could not credibly be called a coincidence. The police interviews and free talks emphasized by Martinez on appeal do not rule out the possibility that Martinez did, in fact, intend the alibi to refer to the crime. The prosecutor's statement was neither false nor a mischaracterization. There was simply no misconduct in this instance.

**2**

¶20 Martinez makes several additional attempts to demonstrate prosecutorial misconduct, none of which warrant detailed discussion. He alleges that prosecutors falsely claimed that Martinez "joked" about missing his first shot at Aguilar, wrongly claimed that Martinez had been accused of committing arson at his elementary school, and fallaciously questioned the veracity of Martinez's claims that he killed Aguilar because he believed Aguilar was a child molester. All of the prosecutors' comments are supported by evidence, including, in some cases, evidence proffered by Martinez himself.[6] These additional allegations, therefore, are

---

[6] For example, both Bedoy and Lopez testified that Martinez laughed about missing his first, close-range shot at Aguilar. Evidence of the school arson allegations against him was in the records provided by Martinez to the jury. Further, the prosecutor's comments as to Martinez's motive properly questioned the link between the alleged motive and Martinez's own claim of having been victimized as a child. The prosecution pointed to the absence in the same documents of any complaint by

meritless.

**B**

¶21     The jury returned separate verdicts finding that Martinez committed felony murder and premeditated murder. Martinez argues that there was insufficient evidence to convict him of felony murder.  He does not challenge the jury's finding of premeditated murder.

¶22     Because felony murder is an alternate theory of first degree murder, *State v. Tucker* (*Tucker I*), 205 Ariz. 157, 167, ¶ 50, 68 P.3d 110, 120 (2003), this Court need not consider a challenge to the sufficiency of the evidence of felony murder when the jury also returns a separate verdict of guilt for premeditated murder.  *Anderson II*, 210 Ariz. at 343, ¶ 59, 111 P.3d at 385 ("In any event, the jury returned separate guilty verdicts for both felony murder and premeditated murder as to each victim; therefore, the first-degree murder convictions would stand even absent a felony murder predicate."); *cf. State v. Smith* (*Todd*), 193 Ariz. 452, 460, ¶¶ 34-36, 974 P.2d 431, 439 (1999) (declining to address issue with premeditation instruction because defendant failed to challenge conviction for felony murder).

¶23     We are, however, concerned about the felony murder

_____

Martinez that when he was a child he had been the victim of molestation.

instruction in this case.  The instruction stated:

> The crime of first degree felony murder requires proof of the following two things:
>
> The defendant committed or attempted to commit a kidnapping; and
>
> In the course of and in furtherance of this crime or immediate flight from this crime, the defendant or another person caused the death of any person.
>
> With respect to the felony murder rule, insofar as it provides the basis for a charge of first degree murder, there is no requirement that the killing occurred "while committing" or "engaged in" the felony, or that the killing be a part of the felony. The homicide need not have been committed to perpetrate the felony.
>
> *It is enough if the felony and the killing were part of the same series of events.*

(Emphasis added.)  The instruction used language long absent from Arizona's felony murder statute.  We have discouraged the use of this instruction because the emphasized sentence is not an accurate description of Arizona's felony murder statute. *State v. Miles*, 186 Ariz. 10, 15, 918 P.2d 1028, 1033 (1996). Although Martinez cannot show prejudice, the instruction does not accurately state the law and we disapprove of its future use.

## C

¶24     The State granted Lopez and Bedoy testimonial immunity as part of plea agreements under which each was permitted to

11

plead to kidnapping, with a maximum sentence of twelve years. Each testified against Martinez at trial. Summey-Montaño pleaded guilty to first degree murder and was sentenced to life imprisonment; his post-conviction relief proceedings, *see* Ariz. R. Crim. P. 32, were pending at the time of Martinez's trial. Martinez sought to compel Summey-Montaño to testify. Summey-Montaño invoked his Fifth Amendment right against self-incrimination. The trial judge held that Summey-Montaño retained that right during the pendency of his initial post-conviction proceedings. *See State v. Rosas-Hernandez*, 202 Ariz. 212, 217, ¶ 14, 42 P.3d 1177, 1182 (App. 2002) ("[I]f a witness' Fifth Amendment privilege survives during a direct appeal, it also survives pending post-conviction relief.").

¶25     Martinez now claims that his Sixth Amendment right to compel a witness to testify on his behalf was violated by the trial court's failure to require Summey-Montaño to testify. We review the denial of a motion to compel for an abuse of discretion. *State v. Corrales*, 138 Ariz. 583, 588-89, 676 P.2d 615, 620-21 (1983).

¶26     A defendant has a right under the Sixth Amendment to compel witness testimony, but the right is "not absolute" and will give way when the witness's preservation of his own Fifth Amendment rights would prevent him from answering relevant

12

questions.  *State v. Harrod* (*Harrod III*), 218 Ariz. 268, ___, ¶¶ 20-21, 183 P.3d 519, 527 (2008).

¶27     Citing *Chavez v. Martinez*, 538 U.S. 760 (2003), Martinez argues that Summey-Montaño enjoyed no Fifth Amendment right to avoid testifying because such a right is implicated only by the *government's* use of compelled testimony.  *Chavez* stands for the proposition that a person subject to interrogation suffers no constitutional injury from the interrogation itself for the purpose of federal civil rights statutes.  *Id.* at 766 ("We fail to see how, based on the text of the Fifth Amendment, Martinez can allege a violation of this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case.") (plurality).  We do not read *Chavez* as thus requiring the government to compel defense witnesses to testify.  Rather, as we recently reiterated, when a witness has continued reason to fear prosecution, the defendant's Sixth Amendment right to compel that witness's testimony may be properly limited.  *Harrod III*, 218 Ariz. at ___, ¶ 23, 183 P.3d at 527; *see also Rosas-Hernandez*, 202 Ariz. at 217, ¶ 16, 42 P.3d at 1182 (stating that a defendant who pleaded guilty "retained the right not to incriminate himself during the . . . period in which a timely *initial* petition for post-conviction relief may be filed")

13

(emphasis added).

¶28     Martinez also claims that the prosecution attempted to skew the jury's understanding of the circumstances of the crimes by failing to offer immunity to Summey-Montaño, and therefore his Fourteenth Amendment due process rights were violated. This allegation of prosecutorial misconduct is not reflected in the record below; we therefore review for fundamental error. *Velazquez*, 216 Ariz. at 311, ¶ 47, 166 P.3d at 102.

¶29     "The state's refusal to grant a particular witness immunity does not violate a defendant's right to due process absent . . . a showing that the witness would present clearly exculpatory evidence and that the state has no strong interest in withholding immunity." *State v. Doody*, 187 Ariz. 363, 376, 930 P.2d 440, 453 (App. 1996). There is no such showing here.

¶30     Martinez claims that the prosecution manipulated the sentencing agreements to prevent co-defendant Summey-Montaño from testifying to the "real reason" for the murder, which was not to cover up a robbery, but to punish Aguilar for the alleged molestation of Summey-Montaño's cousin. But that argument is refuted by the record. The jury heard this information. Both Lopez and Bedoy testified that Martinez knew of the allegations

14

against Aguilar.[7]

D

**¶31**      During jury selection, a juror asked the trial judge about the appellate process.  The judge described the process, noting that "anybody who is convicted of a crime has various Post-Conviction Relief rights.  In other words, they can appeal the conviction.  A higher court can review it and see if I did anything wrong, or if I made any improper rulings, if Mr. Martinez's constitutional rights were violated, that kind of thing."

**¶32**      Martinez claims that the trial judge's comments improperly minimized the jury's role in sentencing him to death. In *Caldwell v. Mississippi*, 472 U.S. 320, 333 (1985), the Supreme Court stated that "[because] the sentence [is] subject to appellate review [only upon] a sentence of death, the chance that an invitation to rely on that review will generate a bias toward returning a death sentence is simply too great."

**¶33**      No *Caldwell* error occurred here.  *Caldwell* applies "only to certain types of comment[s] – those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the

---

[7]    To the extent that evidence of the "real motive" was relevant as mitigation, Martinez himself told the jury in the penalty phase that this was the reason he killed Aguilar.

sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994); *Anderson II*, 210 Ariz. at 337, ¶ 22, 111 P.3d at 379 (same); *see also Caldwell*, 472 U.S. at 343 (O'Connor, J., concurring in part and concurring in the judgment) (prosecutor's "misleading emphasis on appellate review misinformed the jury . . . creating an unacceptable risk that the death penalty [may have been] meted out arbitrarily or capriciously") (quotation marks omitted).

¶34      In contrast, the trial court here properly explained that appellate review largely pertains to the court's legal decisions; further, in preliminary instructions given shortly after the complained-of statement, the court told the jury that the "decision to impose or not impose the death penalty is made by you, the jury, not by the Judge.  Your decision to sentence or not sentence the defendant to death is not a recommendation. Your decision to sentence or not sentence the defendant to death will be binding."

**E**

¶35      Martinez contends that he was improperly forced to use a peremptory challenge to strike a juror whom the trial court should have struck for cause.  We need not address this argument because the juror in question was not seated and Martinez makes no claim that any of the jurors who decided his case should have

16

been struck for cause. *See State v. Glassel*, 211 Ariz. 33, 46-47, ¶ 41, 116 P.3d 1193, 1206-07 (2005); *State v. Hickman*, 205 Ariz. 192, 200-01, ¶¶ 34-36, 40-41, 68 P.3d 418, 426-27 (2003).

F

**¶36** Defense counsel claimed at trial that he was unaware that the State had alleged the (F)(5) pecuniary gain aggravator. Martinez now argues the consequences of trial counsel's apparent lack of preparation. This issue is not appropriate for review on direct appeal. *State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9, 39 P.3d 525, 527 (2002) ("[I]neffective assistance of counsel claims are to be brought in Rule 32 proceedings.").

G

**¶37** Martinez next claims that during the jury's deliberations, the trial judge improperly answered jury questions without notice to him or counsel. This alleged lack of notice was a principal claim in Martinez's motion for a new trial. At the evidentiary hearing on that motion, members of his defense team (but not lead counsel) and Martinez testified that they had no knowledge, or did not remember, that the jury had posed questions; they also claimed that if they had known, they would have responded. The trial judge found, however, based on his recollection, and the affidavit of his bailiff, that the attorneys had, in fact, been contacted and lodged no

objection to the trial court's proposed answers. The trial court rejected Martinez's factual contentions. Because the trial court's conclusion has factual support in the record, we defer to that ruling.[8]

¶38    In any event, the trial court committed no error in its responses addressing the jurors' questions. As the questions and answers set out in the footnote indicate, there was simply nothing erroneous or prejudicial in the trial court's responses.[9]

---

[8]    The better practice is to make a contemporaneous record with counsel about any jury questions and proposed responses. *Cf. State v. Mata,* 125 Ariz. 233, 240-41, 609 P.2d 48, 55-56 (1980) (trial court contacted counsel and offered opportunity to make record).

[9]    The questions and answers were:

> [Q] Is murder as an attempt to cover up a robbery considered a murder for pecuniary gain?
>
> [A] You must rely on the Court's instructions and make your determination. No further explanation is appropriate at this time.
>
> [Q] B. If some jurors agree that there are mitigating circumstances must all jurors be in agreement that a mitigating circumstance exists. A. Must we be unamous [sic] to find for life. [It appears from the record that Judge Fell added the letter designations to this jury question, then answered the question correspondingly].

18

¶39	For similar reasons we reject Martinez's additional claim that the judge wrongfully failed to recognize jury confusion from the questions and to clarify the jury instructions. *See State v. Ramirez*, 178 Ariz. 116, 125-27, 871 P.2d 237, 246-48 (1994) ("[W]hen a jury asks a judge about a matter on which it has received adequate instruction, the judge may in his or her discretion refuse to answer, or may refer the jury to the earlier instruction.") (citation omitted). The trial court acted within its discretion here. It simply referred the jury to the original instructions in two instances and in the third correctly stated the requirement that any verdict be unanimous. The original instructions properly noted that jurors did not have to settle on any single mitigator in order to return a life sentence.

**H**

¶40	Martinez argues the trial court committed fundamental error in instructing the jury that, if it was unable to reach a

---

[A] A. See [Instruction] #1 re: unanimous.
B. You must rely on the instructions given.
No further instructions will be provided.

[Q] The instructions have confused some. Does the verdict have to be unanimous for death or life? Some think only death sentence has to be unanimous[.]

[A] Your verdict must be unanimous no matter what your decision is.

19

verdict at the aggravation phase, the judge would then impose a life sentence. Martinez argues that this misstatement of the law[10] amounted to coercion of the verdict. Although the State conceded at oral argument that the jury instruction was incorrect, there was no coercion here. Indeed, the mistaken instruction *favored* Martinez by suggesting a single holdout juror could forestall death. *Cf. Mills v. Maryland*, 486 U.S. 367, 375 (1988) (death penalty arbitrary when a holdout juror can prevent otherwise unanimous jury from finding *mitigating* factor). The trial court's misstatement of the law did not prejudice Martinez.

**I**

**1**

¶41 During the penalty phase of the sentencing proceeding, Martinez introduced numerous documents, including Child Protective Service ("CPS") reports, police reports, and other records. For example, Martinez introduced documents reporting that he had committed arson at his elementary school, including

---

[10] *Compare* A.R.S. § 13-703.01(E) (Supp. 2007) ("If the trier of fact unanimously finds no aggravating circumstances, the court shall then determine whether to impose a sentence of life or natural life on the defendant."), *with id*. § 13-703.01(J) ("At the aggravation phase, if the trier of fact is a jury, the jury is unable to reach a verdict on any of the alleged aggravating circumstances and the jury has not found that at least one of the alleged aggravating circumstances has been proven, the court shall dismiss the jury and *shall impanel a new jury*.") (emphasis added).

school reports and court records. He also introduced pages of disciplinary records from schools and the juvenile justice system, as well as reports from psychologists and psychiatrists who had interviewed him. Martinez attempted to show that his mother was inattentive and used drugs during pregnancy, that he was of limited intelligence, and that he had been sexually abused. Martinez's expert testified that a combination of drug use, lack of sleep, and his own unresolved feelings about the molestation, along with Aguilar's refusal to admit his own conduct as an alleged child molester, likely triggered the episode that resulted in Aguilar's death.

¶42 The State's rebuttal evidence suggested that Martinez's family life was not as bad as he claimed, that his mother had made efforts to follow up on counseling and control his behavior, and that he exhibited behavior consistent with being a psychopath. The State also argued that in all of the evidence of prior violence by Martinez, nothing indicated a sexual trigger and Martinez himself never reported any sexual abuse until after a half-dozen sessions with his mental health expert in preparation for trial. The State also pointed out that a CPS report submitted as mitigation indicated that a prior suspicion that Martinez had been sexually abused had not been substantiated.

**¶43** Martinez argues that the State's efforts to rebut his mitigation evidence in the penalty phase violated his rights under the Sixth Amendment's Confrontation Clause and deprived him of due process. He objects principally to "hearsay" testimony by juvenile probation officers regarding his behavior, the victim impact statement provided by Aguilar's birth mother, and the claim he committed arson at his elementary school. Because he did not raise these objections at trial, we review for fundamental error. *E.g., State v. Ellison*, 213 Ariz. 116, 132, ¶ 54, 140 P.3d 899, 915 (2006), *cert. denied*, 127 S. Ct. 506 (2006).

**¶44** As Martinez recognized, we rejected a similar Confrontation Clause argument in *State v. McGill*, 213 Ariz. 147, 160, ¶¶ 54-56, 140 P.3d 930, 943 (2006), *cert. denied*, 127 S. Ct. 1914 (2007) (holding hearsay evidence admissible at the penalty phase, consistent with due process, when the "defendant knew about the statements and had an opportunity to either explain or deny them" and when the testimony has "sufficient indicia of reliability to be responsible evidence") (citation omitted). We decline Martinez's invitation to revisit *McGill*.[11]

---

[11] Martinez also argues that reports that he committed arson against his elementary school should have been excluded on other evidentiary grounds. His argument that Rule 404(b), Ariz. R.

¶45	Martinez's assertions regarding the victim impact statement compel no different result. The statement, which was unsworn and not subject to cross-examination, explained that Aguilar aspired to make something of his life and was well-loved by his family. Martinez claims that Aguilar's birth mother should have been subjected to cross-examination, that the statement was false, and that the State should have corrected it. But victim impact evidence is not put on by the State, nor is cross-examination permitted or placing the victim's mother under oath necessary. *See* A.R.S. § 13-4426.01 (Supp. 2007) ("[T]he victim's right to be heard is exercised not as a witness, the victim's statement is not subject to disclosure to the state or the defendant or submission to the court[,] and the victim is not subject to cross-examination.").[12] Finally, the fact that the mother gave Aguilar up for adoption is immaterial

---

Evid., and this Court's related case law addressing the standard for admitting other acts evidence in criminal trials should preclude this evidence is misplaced. Section 13-703(C) (Supp. 2007) mandates that "the prosecution . . . may present any information that is relevant to any of the mitigating circumstances . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials" in the penalty phase of a capital proceeding.

[12] Martinez also claims that the falsity of the victim statement is demonstrated by the State's later "disavowal" of it. This is not an accurate statement of the State's position. In post-trial proceedings, the prosecution merely noted that Aguilar's mother's opinions were her own. *See* A.R.S. § 13-4426.01.

to her status as a victim by consanguinity. *See* A.R.S. § 13-703.01(S)(2).

**J**

**1**

¶46    Martinez raises several arguments relating to jury instructions in the penalty phase.  These arguments focus on the trial court's characterization of the role of jurors in assessing the proper penalty.

¶47    Martinez requested the following jury instruction about assessing mitigation evidence:

> [I]n this phase, the defendant has got to present any relevant evidence which he and his attorneys believe are mitigating factors which will persuade one or more [of you] that the defendant shall be shown leniency and not receive the death sentence.
>
> The State may also present evidence to you in an attempt to demonstrate the defendant should not be shown leniency.
>
> Rather than creating the risk of an unguided emotional response against the defendant, full consideration of evidence that mitigates against the death penalty is essential if you are to give a reasoned moral response to the defendant's background, character and crime.

¶48    The trial court rejected this instruction and offered an alternative that did not include the word "moral"; it also precluded the defense from making a "moral judgment" argument in its opening statement.

24

¶49    "A trial court's refusal to give a jury instruction is reviewed for abuse of discretion."  *Anderson II,* 210 Ariz. at 343, ¶ 60, 111 P.3d at 385 (citing *State v. Bolton,* 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995)).  The legal adequacy of an instruction, however, is reviewed de novo.  *State v. Johnson*, 212 Ariz. 425, 431, ¶ 15, 133 P.3d 735, 741 (2006), *cert. denied,* 127 S. Ct. 559 (2006).

¶50    Martinez contends that the trial court erred in "convert[ing] a moral decision into a factual decision."  He argues that the court misled the jurors in describing their role as reaching a "reasoned" decision, "uninfluenced by sympathy." His argument hinges on the absence of the word "moral" from the instructions.

¶51    The Supreme Court has described the capital sentencing decision as a "reasoned moral response" to mitigation evidence. *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

¶52    The Supreme Court's use of the phrase a "reasoned moral response" describes the result of individualized sentencing that appropriately considers "any aspect of the defendant's character, propensities or record and any of the circumstances of the offense" relevant to determine whether the defendant should be shown leniency.  A.R.S. § 13-703(G); *see*

25

*also Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006) (jury must reach reasoned decision); *Anderson II*, 210 Ariz. at 349, ¶ 92, 111 P.3d at 391 (rejecting claim that instruction that jury should not be "swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling" violated the Eighth Amendment). The superior court here made clear to the jury that it should consider all possible mitigating evidence. The omission of the word "moral" from the final instructions did not render the instructions, as a whole, incorrect or misleading.

¶53 Likewise, we reject Martinez's claim that the court prevented him from urging the jury to employ "moral judgment" in his favor. As the State notes, Martinez explicitly asked jurors to consider the case "in accordance with thousands of years of the Judeo-Christian tradition" and, in fact, traced that tradition from the Exodus to the Sermon on the Mount. Consequently, Martinez was effectively allowed to argue that a death verdict involved a "moral" judgment.

**2**

¶54 Martinez also challenges two other jury instructions. First, he contends that the court erred in instructing the jury that the "defendant has the burden of proving any mitigating circumstance by a preponderance of the evidence" and that "[i]f

26

your decision is that there are no mitigating circumstances or that mitigating circumstances are not sufficiently substantial to call for leniency, your verdict must be that the defendant be sentenced to death." He claims that "[b]oth statements are technically accurate, but they leave the impression that the defendant bears the burden of proving that the mitigation is sufficiently substantial to call for leniency," contrary to *State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 123 P.3d 662 (2005).[13]

¶55 *Baldwin* rejected the state's contention that a jury should be instructed that the defendant bore the burden of proving that the mitigation was substantial enough to call for leniency, finding that neither the state nor the defendant has such a burden of proof. *Id*. at 472, ¶¶ 13-14, 124 P.3d at 666. The rejected instruction dealt with the burden of proof, not the burden of production. Our subsequent cases have held that the jury can properly be told that if it concludes that there is no mitigation or the mitigation is not sufficiently substantial to call for leniency, a death verdict should result. *State v. Tucker* (*Tucker II*), 215 Ariz. 298, 318, ¶ 74, 160 P.3d 177, 197 (2007), *cert. denied*, 128 S. Ct. 296 (2007); *accord Velazquez*, 216 Ariz. at 310, ¶ 43, 166 P.3d at 101 (instruction requiring a

---

[13] The trial here occurred before this Court issued its opinion in *Baldwin*.

verdict of death if jury unanimously finds no mitigating circumstances sufficiently substantial to call for leniency proper "as long as the jury is allowed to consider all relevant mitigating evidence").

¶56      Second, Martinez claims that an instruction requiring jurors to "individually weigh . . . mitigating circumstances against the aggravating circumstances" and describing the manner in which such weighing can be performed, was error. We rejected this argument in *Velazquez.* 216 Ariz. at 310, ¶ 39, 166 P.3d at 101 (noting that term "weigh" may be used to describe juror's decision).

**K**

¶57      Having received a note indicating that the jury was at an impasse, the trial judge stated in open court, with only counsel and Martinez present, that he was "going to bring [the jury] in and declare a mistrial." When the jury returned, the court asked if further deliberations would be helpful. The jurors said yes. The court therefore dispatched the jury to continue deliberating. Martinez now argues that the trial had "ended," and the judge erred by allowing further deliberation. As Martinez's brief concedes, however, the judge "announced [the] intention to declare a mistrial"; he never actually granted a mistrial. Because no mistrial had been declared and

28

the jury indicated that further deliberations would be helpful, the superior court did not abuse its discretion in allowing further deliberations.

<strong>L</strong>

¶58    Martinez next claims he was entitled to a jury determination of his "defense" of mental retardation.  The Eighth Amendment bars the execution of mentally retarded defendants.  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  We noted in *State v. Grell* that Arizona's proceedings for determining mental retardation operate like an affirmative defense.  212 Ariz. 516, 522, ¶ 26, 135 P.3d 696, 702 (2006), *cert. denied,* 127 S. Ct. 2246 (2007).  But our analogy in *Grell* simply illustrated why the burden of proving retardation could be placed on the defendant; no affirmative defense was created.  *See State v. Casey*, 205 Ariz. 359, 362, ¶ 10, 71 P.3d 351, 354 (2003) (explaining that the power to create affirmative defenses lies with the legislature).

<strong>M</strong>

¶59    Martinez raises several Eighth Amendment and statutory challenges to this Court's review of death penalty verdicts under A.R.S. § 13-703.05.[14]   "All legal and constitutional

---

[14]    We decline to consider two of Martinez's Eighth Amendment challenges.   The   first,   that   Martinez's   sentence   is disproportionate compared to the sentences imposed upon other

29

questions are reviewed de novo."  *Harrod III*, 218 Ariz. at \_\_\_,

¶ 38, 183 P.3d at 530.

**1**

**¶60**      In 2002, the legislature ended our independent review of death penalty verdicts for murders committed after August 1, 2002.  *See* 2002 Ariz. Sess. Laws, ch. 1, § 7(B) (5th Spec. Sess.); *see also* A.R.S. § 13-703.04 (Supp. 2003); A.R.S. § 13-703.05.  Section 13-703.05 provides that this Court now only determines whether the trier of fact abused its discretion in finding aggravating factors and determining that a death sentence is appropriate.

**¶61**      The Eighth Amendment prohibits cruel and unusual punishment; however, the provision also "guarantees individuals the right not to be subjected to excessive sanctions."  *Roper v.*

---

murderers, is settled against him, as his counsel correctly conceded at oral argument.  *Pulley v. Harris,* 465 U.S. 37, 50-51 (1984) ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992) (rejecting proportionality review).

The other, that the Eighth Amendment is violated as applied to his case, is waived for lack of argument.  Ariz. R. Crim. P. 31.13(c)(1)(vi) (proper argument "shall contain . . . the reasons therefor, with citations to the authorities, statutes and parts of the record relied on").  In any event, given that the jury properly found aggravating circumstances making Martinez eligible for a capital sentence, the argument is simply another way of arguing proportionality.

*Simmons,* 543 U.S. 551, 560 (2005). Martinez therefore argues that this Court must review the propriety of death penalty verdicts under a de novo standard, just as he claims the Supreme Court reviews excessive fines and punitive damages de novo.

¶62    The Supreme Court, however, has never required de novo review of death sentences; review need only be "meaningful." *Clemons v. Mississippi,* 494 U.S. 738, 749 (1990). "It is a routine task of appellate courts to decide whether the evidence supports a jury verdict and in capital cases . . . to consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed." *Id*. at 748-49. De novo review of the sentencing decision is not constitutionally required. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976) (providing judicial review enough to "promote the evenhanded, rational, and consistent imposition of death sentences under law").

**2**

¶63    Martinez also argues that A.R.S § 13-4037(B) (2001), which directs that "[u]pon an appeal . . . from the sentence on the ground that it is excessive, the court shall have the power to reduce the extent or duration of the punishment imposed, if, in its opinion . . . the punishment imposed is greater than under the circumstances of the case ought to be inflicted"

31

preserves this Court's independent review.

¶64    At one time this Court purported to ground its power for independent review of death sentences in this provision's predecessor. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *abrogated in part by State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Court subsequently has relied exclusively on A.R.S § 13-703.04 and its predecessors for such authority. *E.g.*, *Velazquez*, 216 Ariz. at 313, ¶ 58, 166 P.3d at 104. Because the legislature expressly abolished independent review for murders committed after August 1, 2002, any reliance on A.R.S § 13-4037 in the context of capital sentencing is misplaced.

N

¶65    Martinez challenges both the jury's finding of aggravators and its determination that the mitigation evidence presented was not sufficiently substantial to call for leniency. We review to determine whether "the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-703.05(A). Consequently, "we uphold a decision if there is any reasonable evidence in the record to sustain it." *State v. Morris*, 215 Ariz. 324, 340-41, ¶ 77, 160 P.3d 203, 219-20 (2007), *cert. denied*, 128 S. Ct. 887 (2008) (quotation marks and citation omitted).

32

**¶66** Under A.R.S § 13-703(F)(5), a first degree murder is aggravated if the homicide was committed "as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." Martinez argues that the (F)(5) aggravator was not proven as a matter of law because the State failed to establish that "but for" his pecuniary gain motive, the slaying would not have occurred. *See State v. Garza*, 216 Ariz. 56, 68, ¶ 52, 163 P.3d 1006, 1018 (2007), *cert. denied*, 128 S.Ct. 890 (2008) ("To establish the (F)(5) aggravator, 'the state must prove that the murder would not have occurred but for the defendant's pecuniary motive.'") (quoting *State v. Ring* (*Ring III*), 204 Ariz. 534, 560, ¶ 75, 65 P.3d 915, 941 (2003)). Pecuniary gain, however, need only be *a* motive for the murder, not the sole motive. *See State v. Hyde*, 186 Ariz 252, 280, 921 P.2d 655, 683 (1996) ("Pecuniary gain need not be the exclusive cause for a murder."); *accord State v. Boggs*, ___ Ariz. ___, ___, ¶¶ 73-74, 185 P.3d 111, 126 (2008). The notion of a "but for" relationship merely means that "[t]he state must establish the connection between the murder and motive through direct or strong circumstantial evidence." *Ring III*, 204 Ariz. at 560, ¶ 76, 65 P.3d at 941.

**¶67** The jury did not abuse its discretion in finding the

(F)(5) aggravator here. It heard substantial evidence that Aguilar was beaten and his jewelry taken. The jury heard that he was ferried, while bound, to his own home where more property was taken and was interrogated about the location of other property. In addition, the jury heard evidence that Martinez agreed to "rob" Aguilar. Martinez and his companions took steps throughout the course of the crime to conceal Aguilar from public view: Martinez kept him hidden in the trunk of a car and helped ensure their broken down car was moved to a side street before transferring Aguilar into the Explorer, which prevented the victim from being seen at the gas station. When Aguilar was conducted to the Explorer, Martinez parked the Explorer behind the other car to obscure it from view, and Aguilar was covered with a blanket. Finally, Aguilar's body was burned, an attempt to cover up the kidnapping, the robbery, and the murder itself.

¶68 These facts support the jury's finding that Aguilar was murdered to allow Martinez to keep the stolen property and avoid capture. *See Ellison*, 213 Ariz. at 143, ¶¶ 124-25, 140 P.3d at 926 (record indicated that the defendant's "motive for the murders was to facilitate the burglary" where the defendant went to the victims' house with the intent to burglarize it, knew the area and the victims, and did not conceal identity).

34

¶69     Under A.R.S. § 13-703(F)(6), a first degree murder is aggravated when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner."  "The 'heinous, cruel, or depraved' aggravator is written in the disjunctive and the state need prove only one of the three conditions to trigger application of the aggravating circumstance."  *Grell*, 212 Ariz. at 519 n.2, ¶ 8, 135 P.3d at 699 n.2.  Accordingly, "[a] finding of cruelty alone is sufficient to establish the F.6 aggravator." *Morris*, 215 Ariz. at 341, ¶ 80, 160 P.3d at 220.

¶70     "Cruelty involves the pain and distress visited upon the victims" and "may be found when the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *Anderson II*, 210 Ariz. at 352 n.18, ¶ 109, 111 P.3d at 394 n.18 (quotation marks, substitution, and citations omitted). Substantial evidence supports the jury's conclusion that the killing was "especially cruel."  Martinez was a major participant in beating, kidnapping, and slaying Aguilar. Indeed, he pulled the trigger for the shot that ultimately killed Aguilar.

¶71     The State conclusively established that Martinez's ongoing physical violence against Aguilar caused Aguilar mental

anguish that Martinez knew or should have known would have occurred. *Ellison*, 213 Ariz. at 142, ¶¶ 120-21, 140 P.3d at 925 (mental anguish shown when victims "experienced significant uncertainty as to [their] ultimate fate") (citation omitted). Because the jury heard overwhelming evidence that the slaying was especially cruel, we need not examine "whether the jury abused its discretion in finding that the murders were also heinous or depraved." *Morris*, 215 Ariz. at 341, ¶ 80, 160 P.3d at 220.

¶72    Martinez also argues that the (F)(6) aggravator is "inapplicable" because "[e]verything that was cruel was done by Mr. Summey-Montaño." The record, however, is replete with evidence of Martinez's cruelty and the superior court expressly instructed the jury not to impute Summey-Montaño's conduct to Martinez. *Id*. at 215 Ariz. at 337, ¶ 55, 160 P.3d at 216 ("Jurors are presumed to follow the judge's instructions.").

3

¶73    At the penalty phase, Martinez focused on claims of family problems, including parental inattention. He also argued the more lenient sentences given to Lopez, Bedoy, and Summey-Montaño were mitigating circumstances and that Summey-Montaño was more culpable. Martinez further pointed to the availability of a life sentence, his age, family ties and remorse, his

36

impaired intelligence, and impairment from the use of drugs and alcohol.

¶74     On appeal, however, Martinez focuses almost entirely on his contention that the evidence presented to the jury showed that the victim had committed "contributory conduct" and that Martinez, because he claimed to have been abused as a child, could not control himself when he was informed of Aguilar's alleged molestation of Summey-Montaño's cousin.

¶75     Martinez's attack on the victim's supposed conduct is not a compelling mitigating factor.   Moreover, much of Martinez's argument is not supported by the record.   The very foundation of the claim — that Martinez was himself sexually abused — was undermined by the absence of any evidence that Martinez himself claimed abuse until his life depended on it. The remainder of his mitigation evidence was unfocused and largely rebutted by the State.   The jury did not abuse its discretion in finding this evidence not sufficiently substantial to call for leniency.

o

¶76     The jury also convicted Martinez of kidnapping.   *See* A.R.S. § 13-1304(A)(3) (2001).   It found that the offense was dangerous and involved the intentional or knowing infliction of serious physical injury.   *See* A.R.S. § 13-604(I) (Supp. 2003).

37

¶77    At sentencing, the trial court found aggravating circumstances, including the presence of accomplices, Martinez's criminal history, his use of drugs and alcohol, and "all factors found by the jury that were considered by the jury as aggravating factors including, but not limited to the pecuniary gain" aggravator.  The court sentenced Martinez to an aggravated term of twenty years, to be served consecutively to his death sentence.  Martinez did not object to the trial judge, rather than the jury, finding factors to justify an aggravated sentence.

¶78    In *Blakely v. Washington*, the Supreme Court held that, generally, any fact that increased a defendant's sentence beyond a "statutory maximum" must be proved to the jury beyond a reasonable doubt.  542 U.S. 296, 301-05 (2004).  Martinez now claims his aggravated sentence for kidnapping was error.

¶79    Because Martinez did not object, we review this claim for fundamental error and require that the "defendant . . . establish . . . that fundamental error exists and that the error in his case caused him prejudice."  *Henderson*, 210 Ariz. at 567, ¶¶ 19-20, 115 P.3d at 607 (citation omitted).

¶80    The State argues that no reasonable jury could fail to find the aggravators the court identified.  We agree.  It was uncontested that the kidnapping involved accomplices, a

statutory aggravating factor. A.R.S. § 13-702(C)(4) (Supp. 2003). Likewise, overwhelming evidence demonstrates that Martinez and his cohorts restrained Aguilar, took jewelry from him, and took him to his home where other property was taken from him. A.R.S. § 13-702(C)(6). On this record, the trial court did not commit fundamental error in aggravating Martinez's sentence for kidnapping.

## III

¶81 Martinez raises seventeen issues to avoid preclusion for federal review. They are presented as in his opening brief:

1. The reasonable doubt instruction of *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), dilutes and shifts the burden of proof in violation of the Sixth Amendment to the United States Constitution. Rejected in *Ellison*, 213 Ariz. at 133, ¶ 63, 140 P.3d at 916.

2. The (F)(5) pecuniary gain aggravator is unconstitutionally overbroad and fails to narrow in violation of *Arave v. Creech*, 507 U.S. 463 (1993), and the Eighth Amendment to the United States Constitution. Rejected in *State v. Greenway*, 170 Ariz. 155, 163, 823 P.2d 22, 30 (1991).

3. The (F)(6) cruel, heinous and depraved aggravator is unconstitutionally vague and overbroad because the

39

jury does not have enough experience or guidance to determine when the aggravator is met. The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments to the United States Constitution because it does not sufficiently place limits on the discretion of the sentencing body, the jury, which has no narrowing constructions to draw from and give substance to the otherwise facially vague law. Rejected in *State v. Cromwell*, 211 Ariz. 181, 188-90, ¶¶ 40-45, 119 P.3d 448, 455-57 (2005).

4. Arizona's death penalty statute creates an unconstitutional presumption of death and impermissibly shifts to him the burden of proving that mitigation is sufficiently substantial to call for leniency in violation the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *Baldwin*, 211 Ariz. at 471-72, ¶¶ 9-17, 123 P.3d 665-66.

5. The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution.

Rejected in *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Harrod*, 200 Ariz. 309, 320, ¶ 59, 26 P.3d 492, 503 (2001), *judgment vacated on other grounds by Harrod v. Arizona*, 536 U.S. 953 (2002).

6.  Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *State v. Van Adams*, 194 Ariz. 408, 422, ¶ 55, 984 P.2d 16, 30 (1999).

7.  The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, and 15, of the Arizona Constitution. Rejected in *State v. Sansing*, 200 Ariz. 347, 361, ¶ 46, 26 P.3d 1118, 1132 (2001), *judgment vacated on other grounds by Sansing v. Arizona*, 536 U.S. 954 (2002).

8.  Proportionality review serves to identify which cases are above the norm of first degree murder, thus narrowing the class of defendants who are eligible for the death penalty. The absence of proportionality review of death sentences by Arizona courts denies

41

capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

9. Arizona's capital sentencing scheme is unconstitutional because it does not require the state to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

10. Section 13-703 provides no objective standards to guide the sentencer in weighing the aggravating and mitigating circumstances in violation of the Eighth and Fourteenth Amendments to the United States

42

Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 382, ¶ 90, 26 P.3d 1136, 1153 (2001), *judgment vacated on other grounds by Pandeli v. Arizona*, 536 U.S. 953 (2002).

11. Arizona's death penalty scheme is unconstitutional because it does not require the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *State v. Poyson*, 198 Ariz. 70, 83, ¶ 59, 7 P.3d 79, 92 (2000).

12. Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. Section 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances. The broad scope of Arizona's aggravating factors encompasses

43

nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *Pandeli I,* 200 Ariz. at 382, ¶ 90, 26 P.3d at 1153.

13. The fact-finder in capital cases must be able to consider *all* relevant mitigating evidence in deciding whether to give the death penalty. *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). The trial court's failure to allow the jury to consider and give effect to *all* mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, Section 15, of the Arizona Constitution. Rejected in *McGill*, 213 Ariz. at 161, ¶ 59, 140 P.3d at 944.

14. By allowing victim impact evidence at the penalty phase of the trial, the trial court violated Defendant's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. Rejected

in *Lynn v. Reinstein*, 205 Ariz. 186, 191, ¶¶ 15-17, 68 P.3d 412, 417 (2003).

15. The trial court improperly omitted from the penalty phase jury instructions language to the effect that the jury may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling the jury to assign whatever value it deemed appropriate.  The court also instructed the jury that it must not be influenced by mere sympathy or by prejudice in determining these facts, thus limiting the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. Rejected in *State v. Carreon*, 210 Ariz. 54, 70-71, ¶¶ 83-87, 107 P.3d 900, 916-17 (2005).

16. The death penalty is an irreversible denial of human rights and international law.  Rejected in *State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983).

17. Consecutive sentences for the felony murder conviction and the underlying felony of kidnapping violate A.R.S. § 13-116 (2001) and the double jeopardy clause of the Fifth Amendment to the United States Constitution.

Rejected in *State v. Girdler*, 138 Ariz. 482, 489, 675 P.2d 1301, 1308 (1983) (holding that consecutive punishments for felony murder and predicate felony do not violate double jeopardy).

**IV**

¶82    For the forgoing reasons, we affirm Martinez's convictions and sentences.


_____
                Michael D. Ryan, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice