SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-09-0077-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | Nos. CR2006-012721-001 DT |
| DALE SHAWN HAUSNER, | ) | CR2006-048493-002 DT |
| | ) | CR2007-006031-001 DT |
| Appellant. | ) | CR2008-006364-001 DT |
| | ) | CR2008-007313-002 DT |
| | ) | |
| | ) | |
| | ) | **O P I N I O N** |
| | ) | |
| | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Roland J. Steinle, Judge

**AFFIRMED IN PART; REVERSED IN PART**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                  Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals/Capital Litigation Section
          Lacey Stover Gard, Assistant Attorney General    Tucson
Attorneys for State of Arizona

BRUCE PETERSON, OFFICE OF THE LEGAL ADVOCATE               Phoenix
     By   Thomas J. Dennis, Deputy Legal Advocate
Attorney for Dale Shawn Hausner
_____

**B A L E S**, Justice

¶1      This automatic appeal arises from Dale Shawn Hausner's convictions and death sentences for six murders; he also was convicted and sentenced for seventy-four non-capital offenses. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2011). We reverse

Hausner's conviction for one count of animal cruelty and otherwise affirm his convictions and sentences.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 Between June 2005 and August 2006, Hausner engaged in a series of random shootings in the Phoenix area. He murdered six people, wounded eighteen others, and also shot several dogs and a horse. The human victims were pedestrians or bicyclists; the shootings largely occurred between 10 p.m. and 3 a.m.; and the victims were shot from Hausner's car with 12 gauge or .410 shotguns or a .22 caliber gun. Samuel Deiteman, Hausner's friend and roommate, participated in many of the crimes.

¶3 Hausner was identified through efforts of the Phoenix Police Department. In spring 2006, the police set up an investigative task force after concluding that a serial shooter was involved in an accelerating crime spree. In May 2006, one person (Claudia Gutierrez-Cruz) was killed and five others wounded; eleven more people were wounded from June 1 to July 22. In mid-July, an anonymous caller – later identified as Ron Horton – left a message with the "Silent Witness" program that his friend "Sammy" had said he was involved in the shootings. Horton later met with a police detective, said "Sammy" was Samuel Dieteman, and identified Dieteman in a video taken at a Walmart store that had been set on fire. On July 30, Robin

2

Blasnek was killed with a .410 shotgun while she was walking at night in Phoenix.

¶4        At the request of police, Horton arranged to meet Dieteman at a bar on August 1.  Police saw Hausner, whom they had not previously identified as a suspect, drop Dieteman off at the bar around 6:30 p.m.  Hausner was driving a Toyota Camry, and witnesses had previously told police that a "Camry-type vehicle" had been involved in certain shootings.  The police followed Hausner to a mall, where they placed a GPS tracking device on his car.  Hausner later returned to the bar, spoke with Dieteman in the parking lot for about thirty minutes, and then returned to Hausner's apartment at about 8:20 p.m.

¶5        Shortly after 1 a.m. on August 2, Hausner drove from his apartment and met Dieteman at a casino.  Police officers surreptitiously saw them open the trunk of Hausner's car, wait while a security guard drove past, and then remove a duffel bag and place it on the back seat.  They left the casino.  Over the next two hours, police followed them as they drove through several cities in the southeastern Phoenix metropolitan area. They appeared to drive aimlessly through business and residential neighborhoods, but when they approached pedestrians or bicyclists, they slowed and sometimes circled back to pass the person again.  At about 4 a.m., they returned to Hausner's

apartment, where an officer overheard one of them say "it's probably because of the rain," as they walked inside.

¶6      On the evening of August 2, detectives met with the Maricopa County Attorney, who approved emergency wiretaps for Dieteman's phone and for Hausner's apartment and car. (This opinion, like the parties in their briefs and the trial court in its rulings, refers to the electronic monitoring devices as "wiretaps.") That same night, detectives also obtained warrants from a judge authorizing police to place the wiretaps in the car and apartment.

¶7      From about 9:35 a.m. until midnight on August 3, the police monitored conversations in the apartment. Hausner and Dieteman made several statements implicating themselves in the shootings, including comments boasting or joking about certain killings and mocking their victims. Police also collected items from a bag Dieteman put in the apartment dumpster, including a map of the Phoenix area with markings near some of the shootings. Hausner's and Dieteman's fingerprints were on the map. The discarded items also included .410 shotgun shells; a written note listing Robin Blasnek's name, date, and time of shooting; and newspaper articles and clippings related to the shootings.

¶8      Near midnight on August 3, police arrested Hausner and

4

Dieteman. Hausner later admitted owning shotguns, but told detectives he was not involved in the shootings. He also mentioned that a .410 shotgun had been used in the shootings, a fact the police had not publicized. On August 7, Hausner held a press conference and again denied involvement in the shootings.

¶9 After Hausner's arrest, police searched his apartment and found shotguns, ammunition, and news clippings and videos about the shootings. In Hausner's car, police found .22 shell casings and bullets, as well as .410 shot and 20 gauge shotgun shells. Hausner had once owned two .22 caliber rifles made by the Marlin Company. Based on rifling patterns found on bullets, a forensic expert determined that a .22 Marlin had been used in six of the crimes. The expert also matched shell casings found in Hausner's car to guns used in some of the crimes.

¶10 The State filed eighty-eight charges against Hausner in five indictments: eight counts of first degree, premeditated murder; two counts of aggravated assault; twenty-six counts of drive-by shooting; ten counts of animal cruelty; two counts of discharging a firearm at a non-residential structure; one count of discharging a firearm at a residential structure; one count of discharging a firearm within Tempe city limits; two counts of conspiracy to commit first degree murder; one count of conspiracy to commit animal cruelty; and two counts of arson

5

involving two Walmart stores.

¶11    The cases were consolidated for trial.  Dieteman entered a plea agreement and testified against Hausner, who testified on his own behalf.  A jury found Hausner guilty of eighty offenses and acquitted him of seven.  (The State dismissed one.)  During the aggravation phase, the State presented evidence to prove that the murders of Gutierrez-Cruz and Blasnek were "especially cruel" and thus death-eligible under A.R.S. § 13-751(F)(6).  (This opinion cites the current version of criminal statutes unless they have materially changed since the conduct at issue.)  The State relied on guilt-phase evidence to prove other aggravating factors.

¶12    With respect to Gutierrez-Cruz and Blasnek, the jury found the (F)(6) aggravator because each murder was both "especially cruel" and "heinous or depraved."  The jury found the (F)(6) aggravator with respect to victims Jose Ortis and Marco Carillo because their murders were "heinous or depraved."  With respect to these four victims, the jury also found the murders were committed in a "cold, calculated manner," an aggravating factor under § 13-751(F)(13).  Finally, with respect to these victims and victims David Estrada and Nathanial Shoffner, the jury found both the (F)(1) (conviction of another offense subject to sentence of life imprisonment or death) and

6

(F)(2) (prior conviction of a "serious offense") aggravators.

¶13    Hausner waived mitigation other than allocution.  The jury determined that death was the appropriate sentence for each of the six murder convictions.  The trial court also sentenced Hausner to consecutive life terms for his two convictions for conspiracy to commit first degree murder and various concurrent and consecutive sentences for his other non-capital convictions. This automatic appeal followed.

## DISCUSSION

¶14    This opinion discusses issues that Hausner raised and argued on appeal.  An appendix lists seventeen other constitutional claims that Hauser seeks to preserve for later review, along with the prior decisions of this Court that he identifies as rejecting them.

### A. Dismissal of Prospective Jurors

¶15    Hausner argues that the trial court erred by granting the State's motion to strike potential jurors 235A and 164B, who voiced hesitation, but said they could vote for the death penalty.  He maintains that the trial court dismissed these jurors "merely to taper an over-abundance of qualified jurors" and to make a "clean record through jury selection," and thereby violated *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and *Wainwright v. Witt*, 469 U.S. 412 (1985).

7

¶16     A potential juror may not be struck for cause merely because he "voiced general objections to the death penalty." *State v. Prince (Prince II)*, 226 Ariz. 516, 528 ¶ 27, 250 P.3d 1145, 1157 (2011) (quoting *Witherspoon*, 391 U.S. at 522). However, a trial court "may strike a juror whose views about capital punishment 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Prince II*, 226 Ariz. at 528 ¶ 27, 250 P.3d at 1157 (quoting *Witt*, 469 U.S. at 433).

¶17     During voir dire, when the trial court denied motions to strike certain jurors for cause, it placed them in a "pool" for later reconsideration. The pool included jurors 235A and 164B and six jurors to whom Hausner objected. Subsequently, the trial court – without objection by Hausner – reconsidered the objections to these eight jurors and struck them all. The court noted that there was "no issue" with respect to forty-one jurors remaining on the clerk's juror list (the list was in ascending numeric order, first for "A" jurors and then "B" jurors). The court drew a line after Juror 129B and struck jurors numbered 130B or higher. Having narrowed the field to forty jurors, the court allowed each side to exercise ten peremptory strikes, leaving twenty jurors for trial.

¶18     The trial court did not commit reversible error in

dismissing jurors 235A and 164B.  Any error in dismissing Juror 164B was plainly harmless, as Hausner's counsel acknowledged during oral argument, because this juror was not among the first forty on the clerk's list and thus would not have been in the final pool even if not dismissed for cause.

¶19     During voir dire, Juror 235A said she did not think she could choose between life and death, and did not want to be placed in that situation, but could follow the law and vote to impose death.  She stated that she felt "a little intimidated to make that choice."  The State moved to strike Juror 235A because "she obviously doesn't want to be placed in this situation."

¶20     By granting the State's motion, the trial court apparently struck the juror based on her reluctance to serve rather than her opposition to the death penalty.  We have upheld dismissal when a juror is conflicted about imposing the death penalty, *Prince II*, 226 Ariz. at 528 ¶ 29, 250 P.3d at 1157, and we defer to the trial judge's determination that "a prospective juror would be unable to faithfully and impartially apply the law."  *Witt*, 469 U.S. at 424-26; *see also State v. Ellison,* 213 Ariz. 116, 137 ¶ 89, 140 P.3d 899, 920 (2006).  Given Juror 235A's desire not to serve and her conflicting statements, the trial judge did not abuse his discretion in striking her.

**B. Admission of Wiretap Conversations**

¶21    Hausner argues that the trial court erred in failing to suppress recorded conversations obtained by the wiretap in his apartment on August 3.  The County Attorney approved the wiretap under Arizona's "emergency wiretap" statute, A.R.S. § 13-3015.  This statute allows the Arizona Attorney General, a county attorney, or other designated prosecutors to authorize temporary wiretaps if he or she "reasonably determines that an emergency situation exists involving immediate danger of death or serious physical injury to any person, and that such death or serious physical injury may be averted by interception of wire, electronic or oral communications before an order authorizing such interception can be obtained." *Id.*  Within forty-eight hours, the prosecutor must apply for a court order authorizing the interception in accordance with the general wiretap statute, A.R.S. § 13-3010.  If such authorization is not obtained, the prosecutor must "immediately terminate" the interception, and "any communications intercepted without judicial authorization may not be used as evidence."  A.R.S. § 13-3015(C).

¶22    Hausner argues that the wiretap was illegal because (1) there was not an "emergency situation" under § 13-3015; (2) the wiretap failed otherwise to satisfy statutory requirements; and (3) Article 2, Section 8 of Arizona's Constitution forbids

10

the warrantless intrusion into a home absent exigent circumstances, and police inaction (here, the failure of the police to arrest Dieteman or otherwise intercede) cannot create such circumstances. We reject these arguments.

### 1. Factual and Statutory Background

¶23　　We review the denial of a motion to suppress wiretap evidence for an abuse of discretion, *State v. Ring*, 200 Ariz. 267, 273 ¶ 14, 25 P.3d 1139, 1145 (2001), *rev'd on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), and review questions of constitutional and statutory interpretation de novo, *State v. Armstrong*, 218 Ariz. 451, 463 ¶ 54, 189 P.3d 378, 390 (2008). We consider the evidence presented at the suppression hearing and view the facts in the light most favorable to sustaining the trial court's ruling. *State v. Manuel*, 229 Ariz. 1, 4 ¶ 11, 270 P.3d 828, 831 (2011).

¶24　　On July 28 and 29, Ron Horton told detectives that Dieteman, his former roommate, had said he was involved in the shootings and had used a .410 shotgun. Police had not publicized information about the weapon. Horton also said Dieteman referred to the crimes as "RRV'ing," which stood for random, recreational violence. On July 30, Robin Blasnek was killed with a .410 shotgun while walking at night.

¶25　　When police followed Dieteman on the evening of August

11

1 and early morning of August 2, they saw him meet Hausner, transfer a duffel bag from the trunk to the back seat of Hausner's car, and then drive around in a manner suggesting that Dieteman and Hausner could be looking for victims. Around 4:30 or 5 p.m. on August 2, detectives briefed the County Attorney, who approved emergency wiretaps for Hausner's home and car. That evening, detectives sought and obtained warrants to place the wiretaps.

¶26 On August 3, conversations between Hausner and Dieteman in the apartment were recorded from approximately 9:35 a.m. until 11:55 p.m., when the two were arrested. At around 2 p.m. on August 3, police sought and obtained warrants to search Hausner's apartment and car; the warrants were to be executed that evening between 10 p.m. and 6 a.m. Consistent with A.R.S. § 13-3015, at 4:15 p.m. on August 4, the afternoon after Hausner and Dieteman were arrested, the police submitted an affidavit applying for a court order approving the emergency wiretaps, and the superior court granted the order that day.

¶27 Arizona law generally prohibits the interception of wire, oral, or electronic communications. *See* A.R.S. § 13–3005. Upon proper application, however, a judge may issue an ex parte order authorizing an interception pursuant to A.R.S. § 13–3010:

> [I]f the judge determines on the basis of the facts
> submitted by the applicant that:

1. There is probable cause to believe that a person is committing, has committed or is about to commit a particular crime.

2. There is probable cause to believe that particular communications concerning that offense will be obtained through the interception.

3. Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.

4. There is probable cause to believe any of the following:

(a) Wire or electronic communications concerning the offense are being made or are about to be made by the person over the communication facilities for which interception authority is granted.

(b) Oral communications concerning the offense are being made or are about to be made by the person in the location for which interception authority is granted.

(c) Communications concerning the offense are being made or are about to be made by the person in different and changing locations, or from different and changing facilities.

A.R.S. § 13-3010(C).

¶28     In 1984, we held that Arizona's wiretap scheme substantially complied with federal law, which allows states to adopt more, but not less, restrictive limits on electronic surveillance than are imposed by 18 U.S.C. §§ 2510-2520, the federal wiretap statute colloquially known as "Title III." *See State v. Gortarez*, 141 Ariz. 254, 259 ¶ 4, 686 P.2d 1224, 1229

13

(1984).   In 1988, the legislature enacted § 13-3015, the emergency wiretap provision, as part of legislation intended to conform Arizona law to amendments to Title III. 1998 Ariz. Sess. Laws, ch. 149, § 13 (2d Reg. Sess.).

**¶29**     Arizona's emergency wiretap statute largely tracks federal law, but has some different language.   The federal statute applies when an emergency situation "requires" an interception before a court order authorizing it "can, with due diligence, be obtained."   18 U.S.C. § 2518(7)(a).   Without explicitly referring to due diligence, Arizona's statute allows interception if an emergency "may be averted . . . before an order authorizing such interception can be obtained."   A.R.S. § 13-3015(A).   Arizona's statute requires that an application for an ex parte order be made "as soon as practicable, and in no event later than forty-eight hours" after the emergency interception begins.   *Id.* § 13-3015(B).

### 2.   Existence of an Emergency Situation

**¶30**     Hausner argues that an emergency situation did not exist.   He contends that the State was not faced with an "immediate danger of death or serious physical injury to any person," § 13-3015(A), because the immediate danger must be "clear and present, not speculative and too distant."

**¶31**     Citing *United States v. Crouch*, 666 F. Supp. 1414

14

(N.D. Cal. 1987), Hausner argues that an emergency wiretap is permissible only if the emergency is "imminent" and not merely because "serious criminal activity is planned for some unspecified date in the future." *Id.* at 1417. He contends there was no emergency here because police had no idea whether a criminal act would occur, they did not have any information about "when or where or who might be victimized in a future criminal act," and there was no "immediate danger" because police had him and Dieteman under constant surveillance.

¶32        These arguments ignore the trial court's findings. In denying the motion to suppress, the court noted that there had been a shooting only days before the emergency wiretap was placed. Phoenix police observed Dieteman and Hausner drive as if they might be "trolling for victims" on the night of August 1. Crediting the detectives' testimony, the trial court concluded that police could not have prevented another shooting merely by surveillance because the random shootings were made from a car. Instead, the court found that the police "needed the emergency intercept in order to prevent another random shooting." These findings, which Hausner has not challenged, establish that there was an immediate danger of death or serious physical injury.

¶33        Hausner's argument that "the entire emergency could

15

have been avoided by simply arresting Dieteman, whom police clearly had probable cause to arrest," is also unconvincing. The trial court specifically found that the information the officers had on August 2 was insufficient to support a finding of probable cause to arrest. Even though the police had sufficient information to obtain a warrant to install the wiretaps on August 2, whether probable cause existed to support a wiretap or a search is a different question from whether the officers had probable cause to arrest an individual for having committed a particular crime. *See* A.R.S. § 13-3010(C)(1) (authorizing interception in certain circumstances when there is probable cause to believe a person is about to commit a particular crime).

¶34 Hausner also argues that even if the police did not have probable cause to arrest Dieteman by 5 p.m. on August 2 (when the County Attorney was briefed on the emergency wiretap), they did by 2 p.m. the next day, when they submitted search warrant affidavits asserting they had probable cause to search Hausner's apartment. In this respect, Hausner contends that an emergency wiretap must end if the emergency initially justifying its implementation no longer exists. We disagree. Police "are under no constitutional duty to call a halt to criminal investigation the moment they have the minimum evidence to

16

establish probable cause" to arrest the suspect. *Kentucky v. King*, 131 S. Ct. 1849, 1860–61 (2011) (internal quotation omitted). Police instead may delay making an arrest "in the hope of ferreting out any hitherto unknown individuals involved in the illicit undertakings, gathering additional evidence substantiating the crimes believed to have been committed, or discovering any other offenses in which the suspects are involved." *United States v. Hultgren*, 713 F.2d 79, 87 (5th Cir. 1983).

### 3. Compliance with Other Statutory Requirements

¶35 Hausner argues that the trial court also misconstrued A.R.S. § 13-3015 by failing (1) to recognize that an emergency wiretap is only permitted in circumstances in which a court could order a wiretap under § 13-3010; (2) to interpret the law, like the federal statute, as permitting emergency wiretaps only if a court order cannot be obtained with "due diligence" in time to avert the emergency; and (3) to require the State to have an "emergency purpose" for the wiretap.

¶36 None of these arguments suggests the trial court erred in denying the motion to suppress. We agree that § 13-3015 authorizes emergency wiretaps only in factual circumstances that, if time permitted, would support a court-approved wiretap. As noted above, evidence from an emergency wiretap is admissible

17

only if an application for a court order authorizing the interception "in accordance with the provisions of § 13-3010" is submitted within forty-eight hours and granted.  § 13-3015(B). This conclusion, however, does not avail Hausner because he did not argue below and has not demonstrated on appeal that the superior court erred in approving the emergency wiretap on August 4.

¶37     With respect to "due diligence," although Arizona's statute does not expressly declare that an emergency wiretap is permissible only when a court order approving a wiretap in advance cannot be obtained by "due diligence," such a requirement is implicit.  Section 13-3015(A) allows an emergency wiretap only when it may avert an emergency situation that might occur "before an order authorizing such interception can be obtained."  Subsection (B) further provides that evidence from an emergency wiretap is not admissible unless an application for a court order is submitted "as soon as practicable, and in no event later than forty-eight hours" after the wiretap's inception.  A.R.S. § 13-3015(B).  These statutory restrictions on emergency wiretaps would not be satisfied if a court-approved wiretap could, with due diligence, have been obtained to avert the emergency.

¶38     Although the trial court did not recognize that § 13-

18

3015 effectively incorporates a "due diligence" requirement similar to federal law, *cf. Gortarez*, 141 Ariz. at 259, 686 P.2d at 1229 (concluding that Arizona's conventional wiretap statute was "sufficiently compatible with the federal one to ensure compliance with the federal standards"), this does not mean the court erred in denying Hausner's motion to suppress.  Evidence at the suppression hearing established that a conventional wiretap order could not have been obtained through due diligence on the night of August 2.  Detective Richard Lebel, who prepared the affidavit for a post-wiretap order under § 13-3015, testified that "[i]n terms of a conventional wiretap, there's no way I could have had that prepared for [the judge] that evening."  He also said that, once the emergency wiretap was approved, he had to work almost continuously to complete the forty-one page affidavit to submit the application for a post-wiretap order to the superior court by 5 p.m. on August 4.  The trial judge credited this testimony, noting that "Detective Lebel was very clear that a conventional wiretap request could not be obtained without more facts and in order to get it, would have taken a great deal of time."  In short, the State established that it could not have obtained a conventional wiretap with due diligence when the emergency wiretap was approved.

19

¶39     Finally, Hausner argues that the trial court should have considered whether the County Attorney approved the wiretap for investigative purposes rather than to avert an emergency. This argument is irrelevant given the trial court's finding that "the State's main focus was the safety of the citizens of Maricopa County" and "the investigative nature of its action was secondary to the main goal of public safety." If a prosecutor reasonably determines that an interception may avert an "immediate danger of death or serious physical injury" before a court order approving the interception can be obtained, *see* § 13-3015, the validity of the interception should not turn on whether the prosecutor also subjectively has an investigative purpose, *see King*, 131 S. Ct. at 1859 (noting that in Fourth Amendment context, reasonableness of a search turns on objective factors rather than officer's subjective state of mind).

### 4.   Article 2, § 8 of the Arizona Constitution

¶40     Hausner also argues that the wiretap violated Article 2, § 8 of the Arizona Constitution, which states that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Citing *State v. Ault*, 150 Ariz. 459, 463 n.1, 724 P.2d 545, 549 (1986), he argues that Article 2, § 8 forbids the warrantless intrusion into a home absent exigent circumstances, the exigency cannot be created by

20

police inaction, and any exigency here resulted only because the police chose not to arrest Dieteman or to execute the search warrant they obtained at 2 p.m. on August 3.

¶41    This Court has recognized that Article 2, § 8 may afford greater protections than the Fourth Amendment, at least in the context of physical intrusions into a home.  In *Ault*, police officers had probable cause to arrest a suspect when he met them at the door of his apartment.  *Id*. at 463, 724 P.2d at 549.  Rather than arrest him, they asked him to accompany them to the station, which he agreed to do.  They then followed him, over his objection, when he went inside to get some clothes. Rejecting arguments that the entry was justified because of the danger that the suspect might retrieve a weapon, the Court noted that "[t]he exigent circumstances . . . were created by the arresting deputies" when they did not arrest the suspect when he came to the door.  *Id*. at 463, 724 P.2d at 549.  The Court concluded that it "cannot allow the creation of exigent circumstances in order to circumvent the warrant requirement." *Id.; see also State v. Cañez*, 202 Ariz. 133, 152 ¶ 56, 42 P.3d 564, 583 (2002) (following *Ault*).

¶42    *Ault*, however, does not control our analysis here. For reasons noted above, we reject Hausner's argument that the police had probable cause to arrest Dieteman when the County

21

Attorney approved the emergency wiretap on August 2. Inasmuch as the police made a physical intrusion into Hausner's apartment to place the wiretap, that entry was supported by the warrant issued on the evening of August 2. Finally, to the extent that Hausner argues that exigent circumstances were also required to justify the recording of conversations resulting from the placement of the wiretap, we conclude that such circumstances exist if the statutory requirements for an emergency wiretap exist. *Cf. State v. Bixby*, 698 S.E.2d 572, 582 (S.C. 2010) (upholding South Carolina emergency wiretap provision as application of exigent circumstances exception), *cert. denied*, 131 S. Ct. 2154 (2011).

## C. Joinder

¶43    Hausner argues that the trial court erred by denying his motions to sever and by consolidating the offenses charged in the five indictments for trial. The trial court made these rulings after conducting a multi-day evidentiary hearing and later denied Hausner's renewed severance motions. We review trial court rulings on joinder and severance for an abuse of discretion. *State v. Prince (Prince I)*, 204 Ariz. 156, 159 ¶ 13, 61 P.3d 450, 453 (2003).

¶44    Two or more offenses may be joined in an indictment if they "are alleged to have been part of a common scheme or plan."

22

Ariz. R. Crim. P. 13.3(a)(3). Charges in separate indictments that could have been joined in one indictment may be consolidated "if the ends of justice will not be defeated thereby." Ariz. R. Crim. P. 13.3(c). If offenses are joined under Rule 13.3(a)(3), a court need only order severance when "necessary to promote a fair determination of the guilt or innocence of any defendant." Ariz. R. Crim. P. 13.4(a). Because we conclude that the offenses were properly joined under Rule 13.3(a)(3) or could have been joined under this Rule and were properly consolidated, we do not address the parties' arguments concerning joinder under Rules 13.3(a)(1) or (2).

¶45        For purposes of Rule 13.3(a)(3), a "common scheme or plan" is a "particular plan of which the charged crime is a part." *State v. Ives*, 187 Ariz. 102, 109, 927 P.2d 762, 769 (1996) (internal quotation omitted). The analysis "focus[es] on whether the acts are part of an over-arching criminal plan, and not on whether the acts are merely similar." *Id.* Hausner contends that his crimes, although similar, were not part of a common scheme or plan, citing *State v. Lee*, 189 Ariz. 590, 944 P.2d 1204 (1997).

¶46        In *Lee*, this Court ruled that charges arising from two similar robberies could not be joined under Rule 13.3(a)(3) because the crimes were not "part of an over-arching criminal

23

plan."  *Id.* at 598, 944 P.2d at 1212.  Although the robberies occurred near the same time and were similar in other respects (for example, the victims were similarly employed and were shot with a .22 caliber), the Court noted that "no testimony or evidence suggests that the two robberies were part of a single plan."  *Id.* at 599, 944 P.2d at 1213.

¶47    Here, in contrast to *Lee*, the State presented evidence showing that Hausner's crimes were part of an over-arching criminal plan.  A forensic psychiatrist testified that, after reviewing information about the crimes, he concluded that this scheme was "the seeking of thrills or excitement or relief of boredom or relief of negative feelings."  Such a scheme could include even the killing of animals because, as the psychiatrist testified, "[w]ith respect to trying to make one's self feel better through violence, I think it makes no difference whether the targeted victim is a human or some other animal."  Two detectives also testified about similarities among the various shootings. On this record, the trial court did not abuse its discretion in finding a common scheme or plan based on a general thrill-seeking scheme or by consolidating the charges in the separate indictments.

¶48    Nor did the court abuse its discretion in denying the motions to sever.  "When a defendant challenges a denial of

24

severance on appeal, he must demonstrate a compelling prejudice against which the trial court was unable to protect." *Prince I*, 204 Ariz. at 159 ¶ 13, 61 P.3d at 453 (internal quotation omitted). Hausner cannot show such prejudice because the trial court instructed the jurors to consider each charged offense separately and advised them that the State had to prove each beyond a reasonable doubt. *See id.* at 160 ¶ 17, 61 P.3d at 454.

## D. Sufficiency of Evidence on Animal Cruelty Charges

¶49 Hausner contends that the State presented insufficient evidence to sustain his convictions for animal cruelty involving the horse Apache and dogs Shep, Irving, Payton, and Martin, and his conviction for discharging a firearm at a shed belonging to Payton and Martin's owner. A person may be found guilty of a class 6 felony under Arizona law if he or she "[i]ntentionally or knowingly subjects any animal to cruel mistreatment." A.R.S. § 13-2910(A)(9). Hausner argues that the State did not present sufficient evidence identifying him as the shooter for these incidents.

¶50 We review the sufficiency of evidence presented at trial only to determine if substantial evidence exists to support the jury verdict. *State v. Stroud*, 209 Ariz. 410, 411 ¶ 6, 103 P.3d 912, 913 (2005). Substantial evidence is evidence that "reasonable persons could accept as sufficient to support a

guilty verdict beyond a reasonable doubt." *State v. Hughes,* 189 Ariz. 62, 73, 938 P.2d 457, 468 (1997). We view the facts in the light most favorable to sustaining the jury verdict. *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987).

¶51    Dogs Irving and Shep were shot outside their owners' houses with a .22 caliber gun. Police later found .22 caliber shell casings, guns, and live cartridges in Hausner's apartment and car. Irving and Shep were shot on November 11, 2005, within a mile and an hour of each other. This was also the same night that Hausner shot and killed Nathaniel Shoffner. Just before Irving was shot, one of his owners saw a four-door car pull up and a hand extend from the passenger window. Shep's owner heard a car outside his house, the discharge of a .22, and then his dog's yelp. Dieteman testified that Hausner and his brother Jeff told him they had been "out targeting a dog" on the night when they shot Shoffner. Sufficient evidence supported Hausner's convictions for shooting these two dogs.

¶52    Dogs Martin and Payton were shot outside their owner's house with a .22 on December 30, 2005. Their owner was inside when they were shot, but he heard two pops that sounded like a small caliber weapon firing, followed by a loud cry from one of the dogs. This was the same night that Hausner shot a car at the ABC Bartending School, shot victims Ortiz, Carillo, Timothy

26

Tordai and the dog Peanut with a .22, and also shot the dog Cherokee and victim Clarissa Rowley. Martin and Payton were shot just after midnight, three miles from where Hausner shot the dog Peanut at 12:30 a.m. This is sufficient evidence to support the jury's conclusion that Hausner shot Martin and Payton and discharged a firearm at a shed belonging to their owner.

¶53 Apache, the horse, was shot with a .22 between 10:30 p.m. on July 19, 2005, and 5:30 a.m. on July 20. When shot, Apache was in a pen outside his owner's house in Tolleson. The owner did not see or hear any gunshots. Just before midnight on July 19, Hausner shot and killed the dog Whiskey with a .22 in Phoenix, two miles from where Apache was shot. From this evidence alone, a jury could not reasonably conclude beyond a reasonable doubt that Hausner also shot Apache. Accordingly, we reverse Hausner's conviction and sentence for animal cruelty with respect to the shooting of Apache.

### E. Evidentiary Issues

¶54 Hausner challenges the admission of evidence of out-of-court statements by attempted-murder victims Joseph Roberts, David Perez, and Miguel Rodriguez. Hausner also contends the trial court erred in admitting certain "other acts" evidence.

27

## 1. Roberts' Statements

¶55     Joseph Roberts was shot while walking with his bike on the night of July 2, 2006. Roberts spoke with Detective Clark Schwartzkopf at a hospital the next morning, but Roberts could not recall this meeting when he testified at the 2009 trial. Roberts testified that, after he was shot, he saw a four-door, silver car on the opposite side of the street, but he could not see how many people were inside. He did not remember ever describing the car's driver.

¶56     Detective Schwartzkopf testified about contacting Roberts at the hospital. Schwartzkopf said Roberts told him that "as the vehicle slowed, he saw the driver's window completely down and he saw what he described as a barrel protruding from the driver's side of the vehicle. . . . [H]e believed that it was a rifle or shotgun barrel," and that he thought the driver was Caucasian. Roberts described the car as a "silver, passenger" vehicle, and said its headlights were turned off just before the shooting.

¶57     Hausner objected to Schwartzkopf's testimony about Roberts' statements as inadmissible hearsay. Overruling the objection, the trial court ruled that the statements were admissible as prior inconsistent statements under Arizona Rule of Evidence 801(d)(1). Considering the factors identified in

28

*State v. Allred*, 134 Ariz. 274, 277, 655 P.2d 1326, 1329 (1982), the trial court further found that the statements were not unduly prejudicial. Alternatively, the trial court ruled that the statements were sufficiently reliable to be admissible under the residual hearsay exception in Arizona Rule of Evidence 803(24) (since renumbered Rule 807).

¶58 We review admission of evidence for an abuse of discretion. *See State v. Tucker*, 205 Ariz. 157, 165 ¶ 41, 68 P.3d 110, 118 (2003). A statement is not hearsay if the declarant testifies, the statement is inconsistent with the declarant's testimony, and the declarant is subject to cross-examination about it. Ariz. R. Evid. 801(d)(1)(A). "A claimed inability to recall, when disbelieved by the trial judge, may be viewed as inconsistent with previous statements." *State v. King*, 180 Ariz. 268, 275, 883 P.2d 1024, 1031 (1994) (internal quotation omitted).

¶59 Hausner argues that nothing suggests Roberts feigned lack of memory about his statements in the hospital, and therefore they could not be admitted as "inconsistent" with his trial testimony. *Cf. id.* at 275, 883 P.2d at 1031 (concluding that record supported trial court's finding that witness feigned loss of memory). Moreover, because Roberts could not recall talking to Schwartzkopf, Hausner argues that the trial court

29

erred in finding the statements sufficiently reliable to be admissible under the residual hearsay exception.

**¶60** Although the trial "court has considerable discretion in determining whether a witness's evasive answers or lack of recollection may be considered inconsistent with that witness's prior out-of-court statements," *State v. Salazar*, 216 Ariz. 316, 319 ¶ 15, 166 P.3d 107, 110 (App. 2007), here the court did not find and the record does not suggest that Roberts feigned his lack of memory at trial. Roberts, as one of the shooting victims, would have no apparent reason to do so. *Cf. State v. Robinson*, 165 Ariz. 51, 59, 796 P.2d 853, 861 (1990) (finding trial court did not abuse its discretion in admitting extrinsic evidence of out-of-court statement under Rule 613(b) when court could not tell if witness was being evasive or merely had poor recollection, but record amply suggested reasons for witness to be evasive). The trial court erred in concluding that Roberts' statements at the hospital were "inconsistent" with his testimony and admissible under Rule 801(d)(1).

**¶61** We need not determine if the trial court properly concluded that the statements were also admissible under the residual hearsay exception. Roberts testified that he had seen a four-door silver car across the street after he was shot. The out-of-court hospital statements introduced through Schwartzkopf

30

provided the further details that Roberts was shot by the car's Caucasian driver, who pointed a rifle or shotgun from the driver's window and turned off the car's headlights. Roberts did not identify Hausner as the shooter in his testimony or the hospital statements. Instead, Dieteman testified that Hausner was driving and shot Roberts from the driver's window with a .410 shotgun. Because we conclude that the hospital statements did not impact the jury's verdict, any error in their admission was harmless. *See State v. Bocharski*, 218 Ariz. 476, 486 ¶¶ 38-41, 189 P.3d 403, 413 (2008) (applying harmless error analysis to admission of hearsay).

## 2. Perez and Rodriguez Statements

¶62    Hausner also objected to testimony by two police officers regarding statements made by victims Perez and Rodriguez. Neither victim was available to testify at trial, but the officers testified to statements made by each victim when the officers arrived on the scenes. The trial court admitted the statements as excited utterances. (Although Hausner initially argued that admission of these statements violated the Confrontation Clause, he abandoned that argument in light of *Michigan v. Bryant*, 131 S. Ct. 1143 (2011), as it is clear that the statements were not testimonial.)

¶63    An excited utterance is a statement "relating to a

31

startling event or condition, made while the declarant was under the stress of excitement that it caused." Ariz. R. Evid. 803(2). This exception to the rule generally barring the admission of hearsay turns on three factors: there must be a startling event, the words must be spoken soon afterwards, and the words must relate to the startling event. *State v. Cruz*, 218 Ariz. 149, 161 ¶ 54, 181 P.3d 196, 208 (2008).

¶64 The first victim, Perez, was shot in the early morning on July 7, 2006, and Officer Shoemaker was one of the first officers to arrive at the scene. Shoemaker testified that he asked Perez what happened, and that "[h]e told me he was standing out into the street in front of the property using a telephone when a car, which he described as a blue Contour, drove from west to east in an eastbound manner on State Avenue and fired, what he said, was a shot at me. He told me he didn't see a license plate of the car, he didn't see any possible suspect that may have fired the . . . the shot." Shoemaker explained that he had questioned Perez in order to secure the scene and meet an on-going emergency.

¶65 The trial court did not abuse its discretion in finding that Perez's statements to Officer Shoemaker were excited utterances. The shooting was a startling event; Perez made the statements soon after he was shot; and the statements

32

related to the event.

¶66     Victim Rodriguez was shot on May 31, 2006, and Phoenix Police Officer Baiardi was one of the first to arrive on the scene.  Baiardi testified that Rodriguez told him he was shot and that "[h]e was in a lot of pain" and that "I tried to get as much information as possible, because when the shooting occurred, I wasn't too far from the scene."  He also testified that Rodriguez "told me that . . . the shot, he believed, came from a white vehicle that was going westbound on Indian School . . . [T]he one thing I do remember he said is that it was a white imported car or white foreign vehicle."

¶67     Rodriguez' statements to Officer Baiardi were properly admitted as excited utterances.  Rodriguez was the victim of a shooting and he made statements about the event soon after it occurred.

### 3. Other Acts Evidence

¶68     Hausner also argues that the trial court erred in allowing the State to submit "other acts" evidence that he (1) is bisexual, (2) set fire to a tree, shoplifted, and slashed tires at a casino, (3) was present when his brother, Jeff Hausner, stabbed a man, (4) while in court, made obscene gestures to victim Paul Patrick and Rebecca Estrada, the mother of murder victim David Estrada, and (5) was physically violent

33

toward his ex-wife. We review a trial court's decision to admit evidence of other acts for an abuse of discretion. *State v. Villalobos*, 225 Ariz. 74, 80 ¶ 18, 235 P.3d 227, 233 (2010).

¶69 Evidence of "other acts" generally "is not admissible to prove the character of a person in order to show action in conformity therewith." Ariz. R. Evid. 404(b). But it is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* When the State seeks to admit evidence of other acts of the defendant, it must prove by clear and convincing evidence that the defendant committed the other acts; they must be offered for a proper purpose; they must be relevant; and, consistent with Rule 403, their probative value must not be substantially outweighed by the danger of unfair prejudice. *See State v. Terrazas*, 189 Ariz. 580, 583, 944 P.2d 1194, 1197 (1997).

### a. Evidence of Hausner's bisexuality

¶70 Hausner first challenges the trial court's admitting evidence of his alleged bisexuality. During the guilt phase, Hausner testified on direct examination that Dieteman was bisexual, that he was not, and that several sexually-themed text messages between the two of them were intended to be humorous. Over his objections, the court allowed the State to ask Hausner

34

on cross-examination about his sexuality and to introduce testimony by his ex-wife that she had seen him kiss another man on the neck and that he had once told her he thought he was gay. The trial court ruled that Hausner had opened the door to the issue of his sexual orientation by his own testimony and that this evidence was relevant to his relationship with Dieteman, who participated with Hausner in many of the crimes and whom Hausner suggested was responsible for them. The trial court also instructed the jury, before its deliberations, that:

> "[a]person's sexuality does not make it any more or less likely that a person committed the crimes alleged in the indictment. You are not to consider any allegation of bisexuality to consider if Mr. Hausner committed the crimes alleged in this indictment."

¶71 The trial court did not clearly abuse its discretion in admitting this evidence, particularly given that Hausner himself placed his bisexuality at issue and attempted to distance himself from Dieteman by characterizing their respective sexual orientations. We underscore, however, that trial courts must be cautious in admitting evidence of a witness's sexual orientation in cases in which it is not directly relevant, given the danger that it may be unfairly prejudicial. Any error in admitting evidence of Hausner's bisexuality, moreover, was harmless because the trial court instructed the jurors not to consider such evidence in

35

determining if Hausner committed the alleged crimes. *See State v. Velazquez*, 216 Ariz. 300, 307-08 ¶ 24, 166 P.3d 91, 98-99 (2007).

### b. Acts of vandalism, arson, and shoplifting

¶72    Hausner also contends the trial court erred in admitting evidence that he and Dieteman set a palm tree on fire, shoplifted, and slashed tires in a casino parking lot. During his direct examination, Hausner testified that he would never harm a person or an animal, that he "would never harm anything," and that he was "not a violent person." On cross-examination, Hausner denied shoplifting or setting a tree on fire, but admitted slashing tires. Dieteman subsequently testified that he was with Hausner and Jeff when they set fire to a tree and that he and Hausner regularly shoplifted alcohol, DVDs, and games. The State also presented testimony from security guards at the casino where the tires were slashed and from a Chandler police officer regarding the tree burning.

¶73    The trial court did not abuse its discretion in allowing other acts evidence tending to show Hausner's violent nature, including the tire slashing and the tree burning. Hausner opened the door to such evidence, and thereby waived any objection to its admission by testifying on direct that he was not a violent person. *See State v. Arriola,* 99 Ariz. 332, 334-

36

35, 409 P.2d 37, 39-40 (1965). Evidence Rule 404(a)(1) allows the admission of "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." This rule allowed the State to introduce evidence to rebut Hausner's testimony about his non-violent nature.

¶74        Dieteman's testimony regarding shoplifting habits, however, is not admissible to rebut Hausner's assertions that he is not violent. Such evidence was perhaps of some relevance in rebutting Hausner's assertion that he magnanimously allowed Dieteman to live with him, inasmuch as both were earning money by stealing. In any event, any error in admitting the shoplifting evidence was harmless because the trial court instructed the jury that it could not consider the evidence to determine Hausner's character or character trait or to determine that he acted in conformity with the same and therefore committed the charged offenses.

### c. Evidence of stabbing

¶75        On direct examination, Hausner testified that he knew that his brother Jeff had been arrested for stabbing a man, but Hausner said he was not present at this stabbing. He further testified that he had never been present with Jeff and Dieteman at a stabbing and had not met Dieteman until several days after the stabbing.

¶76    Over Hausner's objection, the State subsequently elicited testimony from Dieteman that he and Hausner were present when Jeff committed the stabbing.  Because Hausner discussed the stabbing in direct examination, he cannot claim error from the State's introducing evidence to contradict his denials.  *See Arriola*, 99 Ariz. at 334-35, 409 P.2d at 39-40.

### d. Obscene gestures in courtroom

¶77    During cross-examination, Hausner testified that he thought the murders were tragic and had felt that way during the entire trial.  The prosecutor asked Hausner if he had made obscene gestures in the courtroom to victim Paul Patrick and to Roberta Estrada, mother of victim David Estrada.  Hausner denied doing so.  Over Hausner's objection, the State later presented testimony by Patrick and Roberta Estrada, each of whom said that Hausner had gestured to them by raising his middle finger.

¶78    The trial court did not err in admitting this evidence of Hausner's in-court demeanor, given Hausner's assertion on cross-examination that throughout the trial he had thought the murders were tragic.

### e. Acts of violence against ex-wife

¶79    The trial court permitted Hausner's ex-wife to testify to specific incidents of violence, including that, in 2001, Hausner drove her to Wickenberg and held her at gunpoint in the

38

desert, and on another occasion, he chased her down in his car, caught her, and ripped her clothing.

¶80 Hausner opened the door to this evidence by testifying that he was non-violent and would never harm anyone or anything. The court specifically found that the ex-wife's testimony about Hausner's prior assaults was admissible under Rule 404(b) and not unduly prejudicial under Rule 403. On the day his ex-wife testified, the court gave the jury an appropriate 404(b) limiting instruction, and the court in its final instructions generally directed the jurors that they could not consider other acts to show that Hausner acted in conformity with a character trait and therefore committed the charged offenses. The trial court did not abuse its discretion in admitting this evidence.

### f. Denial of surrebuttal

¶81 Hausner contends that the trial court erred by refusing to allow him to present surrebuttal evidence to the other acts evidence.

¶82 Because trial courts must be able to limit the presentation of witnesses and other evidence on collateral issues, only rarely will a trial court abuse its discretion in denying surrebuttal. *State v. Steelman*, 120 Ariz. 301, 319, 585 P.2d 1213, 1231 (1978); *see* Ariz. R. Crim. P. 19.1. Hausner had an opportunity to deny the other acts during his testimony, and

39

the trial court did not abuse its discretion in refusing to allow surrebuttal testimony.

### F. Constitutionality of Abuse of Discretion Review

¶83       Under A.R.S. § 13-756(A), this Court reviews death sentences to determine if the jury abused its discretion in finding aggravating circumstances and imposing a sentence of death.  Hausner argues that the abuse of discretion standard violates the Eighth Amendment or due process.  Recognizing that *State v. Martinez*, 218 Ariz. 421, 189 P.3d 348 (2008), rejected arguments that the Eighth Amendment requires independent review of death sentences, Hausner argues that *Martinez* did not consider the importance of independent review in ensuring that Arizona's sentencing scheme "genuinely narrows the class of persons eligible for the death penalty."

¶84       We decline to reconsider *Martinez*.  *See State v. Cota*, 229 Ariz. 136, 153 ¶ 92, 272 P.3d 1027, 1044 (2012) (citing *Martinez* in observing "we have already determined that abuse of discretion review is constitutional").

### G. Jury Findings that Four Murders were "Especially Heinous, Cruel, or Depraved"

¶85       Under A.R.S. § 13-751(F)(6), a first degree murder is aggravated when "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner."  Hausner argues

40

that the jury abused its discretion in finding the (F)(6) aggravating factor with respect to the murders of victims Ortis, Carillo, Gutierrez-Cruz, and Blasnek. The jury found that each of these murders was committed in an especially heinous or depraved manner; it also found the murders of Gutierrez-Cruz and Blasnek were especially cruel.

¶86 "Heinousness and depravity go to a defendant's mental state as reflected in his words and actions at or near the time of the offense." *State v. Johnson*, 212 Ariz. 425, 439 ¶ 55, 133 P.3d 735, 749 (2006). Cruelty, in contrast, depends in part on the victim's mental state. To establish cruelty, the State must prove beyond a reasonable doubt that "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *Martinez*, 218 Ariz. at 436 ¶ 70, 189 P.3d at 363 (citation and internal quotation marks omitted).

¶87 To establish that the murders were especially heinous or depraved, the State presented evidence that Hausner had relished the murders. "Relishing refers to words or actions that show debasement or perversion," *State v. Greene*, 192 Ariz. 431, 439 ¶ 34, 967 P.2d 106, 114 (1998) (internal quotation omitted), and "requires that the defendant say or do something, other than the commission of the crime itself, to show he

41

savored the murder." *State v. Doerr*, 193 Ariz. 56, 67-68 ¶ 54, 969 P.2d 1168, 1179-80 (1998) (internal quotation omitted). A defendant's "post-murder statements suggesting indifference, callousness, or lack of remorse" can constitute relishing, so long as "they indicate, beyond a reasonable doubt, that the killer savored or enjoyed the murder at or near the time of the murder." *Greene*, 192 Ariz. at 440-41 ¶ 39, 967 P.2d at 115-16.

¶88    The jury here was instructed as follows:

> Defendant relished the murder if defendant, by words or actions, savored the murders. These words or actions must show debasement or perversion and not merely the defendant had a vile state of mind or callous attitude.
>
> Statements suggesting indifference as well as those reflecting calculated plan to kill, satisfaction over the apparent success of the plan, extreme callousness, lack of remorse, or bragging after the murder are not enough unless there is evidence that the defendant fully relished the act of murder at or near the time of the killing.

¶89    Hausner does not challenge the instructions with respect to relishing, but instead argues that there was insufficient evidence from which the jury could conclude that he relished the act of killing "at the time he was doing it."

¶90    In reviewing whether a jury has abused its discretion in finding an aggravating factor, we "review[] the record to determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roque*, 213 Ariz. 193,

42

218 ¶ 93, 141 P.3d 368, 393 (2006). "Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *Id.* (internal quotations omitted).

¶91 Substantial evidence supports the jury's finding that Hausner relished the four murders at or near the time he committed them. Blasnek was his last victim; he killed her on the night of July 30, 2006. In recorded conversations in his apartment on August 3, Hausner joked with Dieteman about killing Blasnek and other victims and declared, "I love shooting people in the back, it's so much fun." He and Dieteman read each other articles about the serial shooting investigation and Blasnek's murder. Responding to a police tally of six victims, Hausner said, "It's higher than that! What about the guy I fucking shot at 27[th] Avenue in the yard?" When Dieteman told him that police were looking for similar crimes in other states, Hausner responded, "so we're being copycatted, Sam? We're pioneers, Sam? We're leading the way for a better life for everybody, Sam?"

¶92 Hausner, after listening to Dieteman read an article about the Blasnek shooting, said "She was on her knees. 'Oh, I've been shot!' Blood pouring out, right." He then said, in a voice mimicking Blasnek's, "I've been shot," and he and Dieteman

43

mimicked crying, laughed, and referred to Blasnek scornfully. Reading from an obituary, Dieteman later asked Hausner if he knew a "Blasnek," and Hausner responded "I know a 'blast neck.'" Hausner also recorded, on a piece of paper, Blasnek's name and the date and time of her murder.

¶93      Gutierrez-Cruz, the next-to-last victim, was shot by Hausner and Dieteman with a .410 shotgun on May 2, 2006, and died while in surgery. Two days after the shooting, Hausner, according to Dieteman, came to their apartment in a "jovial" mood, with a "big grin on his face," and read Dieteman a newspaper article describing the murder. Hausner told Dieteman, "Oh, dude, you got the first murder of the year in Scottsdale. I'm jealous."

¶94      Hausner murdered Carillo and Ortis within two blocks of each other in Phoenix on December 29, 2005. That same evening, in the same area, he shot and attempted to kill another pedestrian, who survived. The following night, Hausner shot and attempted to kill yet another victim, who also survived. He kept news clippings about each of the four murders.

¶95      Hausner argues that retaining news clippings and bragging about a murder after the fact do not suffice to establish relishing. The evidence showed, however, that Hausner did not merely keep some news stories or brag about the murders.

44

Hausner demonstrated through his words and actions that, as he said, he "loved shooting people in the back." Words or actions after a murder may prove the murderer savored the act of killing at or near the time it occurred. *See State v. West,* 176 Ariz. 432, 437, 862 P.2d 192, 197 (1993)(defendant bragging to multiple people about murdering older man and describing how he killed him was relishing), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1998). The evidence amply supported a jury finding that Hausner savored the murders at or near the time he committed them.

¶96     Hausner also argues that the jury abused its discretion in finding the murders of Gutierrez-Cruz and Blasnek especially cruel. Because the finding that each of these murders was heinous or depraved suffices to establish the (F)(6) aggravator, we need not address the jury's finding of cruelty. *See State v. Morris*, 215 Ariz. 324, 341 ¶ 80, 160 P.3d 203, 220 (2007).

### H. Jury Findings that Certain Murders were Committed in a "Cold, Calculated Manner"

¶97     The (F)(13) aggravator qualifies a first degree murder for the death penalty if "[t]he offense was committed in a cold, calculated manner without pretense of moral or legal justification." A.R.S. § 13-751(F)(13). The jury found this aggravator with respect to the murders of Ortis, Carillo,

45

Gutierrez-Cruz, and Blasnek.

**¶98**     Hausner contends that the (F)(13) aggravator is unconstitutional on its face, the jury was erroneously instructed as to its meaning, it does not sufficiently narrow the application of the death penalty, and it was not supported by the evidence.

**¶99**     We review constitutional issues de novo, and, when possible, construe statutes to uphold their constitutionality. *State v. Hargrave*, 225 Ariz. 1, 13 ¶ 42, 234 P.3d 569, 581 (2010).  The death penalty may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. *Furman v. Georgia*, 408 U.S. 238, 256 (1972).  To pass constitutional muster, then, an aggravator must meet two criteria: the circumstance may not apply to every defendant convicted of a murder, but only to a subclass, and the aggravating circumstance may not be overly vague. *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).

**¶100**     Vagueness is a difficult concept to analyze, but sentencing factors that the Supreme Court has found to be impermissibly vague have often been those that present a "specific proposition that the sentencer had to find true or false (*e.g.,* whether the crime was especially heinous,

46

atrocious, or cruel)." *Id.* at 974. Where a sentencing factor is a specific proposition, such as "cold and calculated," the concern is that it have some "common-sense core of meaning . . . that criminal juries should be capable of understanding." *Id.* at 975 (internal quotation omitted).

¶101 Although this Court has never addressed the constitutionality of the (F)(13) aggravator, state supreme courts in Illinois and Florida have considered similar aggravators. The Illinois Supreme Court upheld an aggravator for murders that were "cold, calculated, and premeditated," finding that it was not unconstitutionally vague. *People v. Johnson*, 609 N.E.2d 294, 372-73 (Ill. 1993). (Illinois has since abolished the death penalty.) In contrast, the Florida Supreme Court ruled that Florida's cold, calculated and premeditated ("CCP") aggravator was unconstitutionally vague. *Jackson v. State*, 648 So. 2d 85, 90 (Fla. 1994). The Florida statute made murders death-eligible if they were "committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification." Fla. Stat. Ann. § 921.141(5)(i). The court in *Jackson* concluded that "[w]ithout the benefit of an explanation that some 'heightened' form of premeditation is required to find CCP, a jury may automatically characterize every premeditated murder as involving the CCP

47

aggravator."  648 So. 2d at 89.

¶102    *Jackson* is instructive.   Although Arizona's statute differs from Florida's in that it omits the word "premeditated," and instead allows for death penalty eligibility if "[t]he offense was committed in a cold, calculated manner without pretense of moral or legal justification," Arizona's (F)(13) aggravator otherwise tracks the language of Florida's statute. A.R.S.  § 13-751(F)(13).   In *Jackson*, the court found the jury received "no instruction to illuminate the meaning of the terms 'cold,' 'calculated,' or 'premeditated.'"  648 So. 2d at 89-90. Without further instruction, the *Jackson* court noted, "[i]t would also be reasonable for the general public to consider premeditated first degree murder as 'cold-blooded murder.'"  *Id.* at 89.  On its face, Arizona's (F)(13) aggravator suffers from the same vagueness infirmity as Florida's statute.

¶103    An aggravator that is vague on its face, however, can be properly narrowed by a court to bring it within constitutional bounds.  *State v. Chappell*, 225 Ariz. 229, 237 ¶ 26, 236 P.3d 1176, 1184 (2010), *cert. denied,* 131 S. Ct. 1485 (2011) ("vagueness. . . . may be remedied with appropriate narrowing instructions.") (internal quotation omitted); *see also State v. Tucker*, 215 Ariz. 298, 310 ¶ 28, 160 P.3d 177, 189 (2007); *Walton v. Arizona*, 497 U.S. 639, 655 (1990), *overruled*

48

*on other grounds by Ring*, 536 U.S. 584. In *Jackson*, upon remand, Florida's CCP aggravator was narrowed through jury instructions defining its terms, 648 So. 2d at 89-90, and subsequent death sentences in Florida, under these narrowing instructions, have been upheld. *See, e.g., McWatters v. State*, 36 So. 3d 613, 643 (Fla. 2010), *cert. denied*, 131 S. Ct. 510 (2010).

¶104    The trial court here gave narrowing instructions substantially the same as those approved in *Jackson*. It clarified to the jury that "all first degree premeditated murders are, to some extent, committed in a cold, calculated manner," but distinguished this aggravator as one that "cannot be found to exist unless . . . the defendant exhibited a cold intent to kill and is more contemplative, more methodical, more controlled than that necessary to commit premeditated first degree murder." The instruction further defined the term "cold" as "a product of a calm and cool reflection" and "calculated" as "having a careful plan or prearranged design to commit murder." The court emphasized that the jury must look to the defendant's state of mind at the time of the offense to determine whether there exists any pretense of moral or legal justification that rebuts cold and calculated, and that it must find beyond a reasonable doubt that there is (1) a careful plan or prearranged

49

design before the murder, and (2) a cool and calm reflection for a substantial period of time before the murder.

¶105     This instruction adequately narrowed the aggravator, making it clear that it is not the cold and calculated nature of *every* murder that will satisfy it, but that the jury must find some degree of reflection and planning that goes *beyond* the premeditation required to find first degree murder, channeling the jury's discretion by "clear and objective standards" that provide "specific and detailed guidance." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

¶106     Apart from arguing that the (F)(13) aggravator is facially vague, Hausner also contends that the trial court incorrectly defined particular terms in its narrowing instructions.  Specifically, he argues:  the instructions incorrectly defined "cold;" the term "calculated" was superfluous; and the trial court's explanation of "without pretense of moral or legal justification" "makes no sense at all in conjunction with Arizona's law."

¶107     "We review de novo whether jury instructions adequately state the law." *State v. Gallardo*, 225 Ariz. 560, 567 ¶ 30, 242 P.3d 159, 166 (2010) (internal quotation omitted). Because Hausner did not object to the (F)(13) instructions on these grounds below, however, he is not entitled to relief

50

unless he can show fundamental error.

¶108     The trial court did not incorrectly define the terms of the (F)(13) aggravator.  The court instructed the jury that "[c]old means the murder was a product of a calm and cool reflection.     Calculated  means  having  a  careful  plan  or prearranged design to commit murder."     Arizona cases have previously used the terms "cold" or "cold-blooded" to describe murders or crimes marked by a lack of emotion in the act of killing.    *See, e.g.*, *King*, 180 Ariz. at 286, 883 P.2d at 1042 (describing the thought out, deliberate killing to eliminate a witness as "cold-blooded"); *State v. Schurz*, 176 Ariz. 46, 56, 859  P.2d  156,  166  (1993)  (describing  the  deliberate,  careful burning to death of a person who attempted to flee as "cold-blooded"); *Gretzler*, 135 Ariz at 58, 659 P.2d at 17 (describing the cold blooded murder of nine persons, including shooting sleeping children as they lay in their beds).    Nor did the trial court's definition make superfluous the term "calculated," which the  instructions  defined  to  mean  "having  a  careful  plan  or prearranged design to commit murder."

¶109     Hausner also faults the trial court's definition of "without pretense of moral or legal justification."    The court instructed the jury that this phrase means without "anything of justification or excuse that, though insufficient to reduce the

degree of murder, nonetheless rebuts the otherwise cold, calculated nature of the murder." Hausner contends the court should have explained to the jury the legal justifications that exist under Arizona law. But this mistakenly presumes that the jury could only consider legally recognized justifications. The statute refers more broadly to a "pretense" of legal or moral justification, and the trial court reasonably defined this as "anything of justification or excuse."

¶110     The trial court properly narrowed the (F)(13) aggravator so that it was constitutional, despite its facial vagueness, and it defined the terms to the jury in a permissible manner that did not constitute fundamental error.

¶111     Hausner also argues the jury abused its discretion in finding the (F)(13) aggravator, contending that his murders could not have been "cold and calculated" because they were "random." We disagree. The fact that victims were randomly targeted does not preclude a finding of the elements of the (F)(13) aggravator. There is ample evidence that Hausner had a careful plan or prearranged design for each of the four murders even if he randomly identified the particular victim. The jury could also find that he exhibited a cool and calm reflection for a substantial period of time before killing and that he had no pretense of moral or legal justification or excuse.

52

¶112    We note that Hausner has not argued that there was any constitutional error based on the trial court adopting narrowing instructions for (F)(13) that had not been approved by this Court before he committed the relevant murders. *Cf. State v. Schmidt*, 220 Ariz. 563, 566 ¶ 10, 208 P.3d 214, 217 (2009) (holding that use of vaguely defined statutory aggravator as sole factor to enhance sentence violated due process). We do not address whether the trial court erred in this respect.

¶113    Finally, we conclude that any error by the trial court in applying the (F)(13) aggravator - and we have not identified any for reasons explained above - was harmless beyond a reasonable doubt. This Court may apply "harmless-error analysis when errors [regarding sentencing factors] have occurred in a capital sentencing proceeding," *Clemons v. Mississippi*, 494 U.S. 738, 754 (1990), so long as the errors do not permit the sentencer to consider otherwise inadmissible evidence. *Id.* n.5; *see Brown v. Sanders*, 546 U.S. 212, 220-21 (2006) (stating that due process requires reversal of death sentence if invalid sentencing factor allowed sentencer to consider evidence that otherwise would not have been before it); *cf. Jennings v. McDonough,* 490 F.3d 1230, 1249-50 (11th Cir. 2007) (approving Florida Supreme Court's harmless error analysis with regard to vaguely defined aggravator).

¶114     The use of the (F)(13) aggravator did not allow the jury to consider any evidence that otherwise would not have been before it.  The jury properly found three other aggravators – the (F)(1), (2), and (6) – with respect to each of the four victims for which it also found the (F)(13).  Hausner presented no mitigation evidence.  In these circumstances, we conclude that any error regarding the (F)(13) aggravator did not influence the jury's decision to impose death sentences.  *Cf. State v. Sansing*, 206 Ariz. 232, 241 ¶ 38, 77 P.3d 30, 39 (2003) (affirming court-imposed death sentence upon concluding that any reasonable jury would have found the mitigation was not sufficiently substantial to call for leniency).

### I. Waiver of Presentation of Mitigation

¶115     Hausner argues that the trial court should not have allowed him, over his lawyers' objection, to waive the presentation of mitigation during the penalty phase.

¶116     A defendant may waive mitigation if he is competent and makes the decision knowingly, intelligently, and voluntarily.  *State v. Murdaugh*, 209 Ariz. 19, 33-34 ¶¶ 70-71, 97 P.3d 844, 858-59 (2004).  The trial court ordered Hausner to undergo a competency examination when he stated that he wished to waive the presentation of mitigating evidence.  After the examiner concluded that Hausner was competent, the trial court

54

confirmed with Hausner that he had discussed his decision and its consequences with his counsel. The court then found that he had knowingly, intelligently, and voluntarily waived mitigation. Hausner does not challenge these findings.

¶117    During the penalty phase, Hausner's lawyers did not make an opening statement or closing argument. During allocution, Hausner apologized to his family and to the victims, but he also urged the jury to sentence him to death: "I'm willing to take whatever punishment you guys give me, and I firmly believe, to help the victims heal, that should be the death penalty." The trial court instructed the jury that it was not limited to considering mitigating circumstances offered by the defendant, that it must consider any relevant mitigating evidence offered during any phase of the trial, and that each juror must individually determine whether the mitigation was sufficiently substantial to call for leniency.

¶118    Although the proceedings here complied with *Murdaugh*, Hausner argues that we should reconsider that decision. He contends that allowing a defendant to waive mitigation prevents the jury from considering all relevant mitigation in determining whether to impose a death sentence. He also argues that *Murdaugh* misinterpreted *Blystone v. Pennsylvania*, 494 U.S. 299 (1990). These arguments are not convincing. *Blystone* rejected

55

an Eighth Amendment challenge to a death sentence imposed by a jury that was instructed, as was the jury here, that it should consider any mitigation evidence presented at trial in deciding on the penalty. Although the defendant in *Blystone* waived the presentation of mitigation, the Supreme Court held that the sentencing procedures did not impermissibly preclude the jury from considering all relevant mitigation evidence presented at trial. *See id* at 307-08.

¶119 Hausner also has no viable argument that the Sixth Amendment requires the defense to present mitigation despite the defendant's waiver. In *Schriro v. Landrigan*, the Court held that a defendant could not establish the prejudice prong for a claim of ineffective assistance of counsel related to counsel's failure to investigate mitigation evidence when the defendant decided to not present any mitigation. 550 U.S. 465, 476, 481 (2007). Indeed, requiring the defense to present mitigating evidence over the defendant's opposition arguably would conflict with the defendant's Sixth Amendment right to self-representation. *See United States v. Davis*, 285 F.3d 378, 384–85 (5th Cir. 2002); *People v. Blair*, 115 P.3d 1145, 1177-78 (Cal. 2005).

¶120 Hausner notes that the New Jersey Supreme Court, recognizing the state's interest in a fair and reliable

sentencing determination, has held that mitigation must be presented even over the defendant's objection. *State v. Koedatich*, 548 A.2d 939, 992-97 (N.J. 1988). We find more persuasive the majority of courts that have declined to follow *Koedatich* and instead have held that a capital defendant may waive the presentation of mitigation. *See, e.g.*, *Blair*, 115 P.3d at 1178-79 (citing state and federal cases); *State v. Jordan*, 804 N.E.2d 1, 16-17 (Ohio 2004) (rejecting *Koedatich* as inconsistent with autonomy of defendant and for its reliance on subsequently repudiated California case law); *State v. Arguelles*, 63 P.3d 731, 752-53 (Utah 2003) (noting that the "vast majority" of courts have held that a capital defendant may waive the presentation of mitigation and declining to follow *Koedatich*).

¶121  The State correctly notes that the Supreme Court has never imposed an "informed and knowing" requirement upon a defendant's decision to waive the presentation of mitigation, *see Landrigan*, 550 U.S. at 47, but this Court has consistently required a voluntary, knowing, and intelligent waiver of this important constitutional right, *see*, *e.g.*, *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 34, 250 P.3d 1131, 1137 (2011) (affirming capital sentence imposed after trial court ordered competency evaluation and found defendant knowingly and intelligently

57

waived right to present mitigation); *State v. Bearup*, 221 Ariz. 163, 173 n.3, 211 P.3d 684, 694 (2009) (noting trial court had conducted colloquies and determined defendant had knowingly, intelligently, and voluntarily waived right to counsel and to present mitigation during penalty phase). Here, the trial court took steps to ensure that Hausner was competent and that he knowingly, intelligently, and voluntarily waived mitigation.

¶122 We commend the approach adopted by the trial court and, in our supervisory capacity, direct that similar procedures be prospectively applied when a capital defendant elects to waive the presentation of all mitigation. *See* Ariz. Const. art. 6, § 3; *cf. State v. Ashworth*, 706 N.E.2d 1231, 1237 (Ohio 1999) (requiring trial court to inquire if the waiver of all mitigating evidence in a capital case is knowing, voluntary, and competent). The trial court should engage the defendant in a colloquy to ensure that the defendant understands the penalty phase process, the right to present mitigation, and the consequences of waiving this right. Defense counsel should confirm on the record that he or she has discussed with the defendant the nature of the mitigation that could be presented and the consequences of waiver. The court should confirm on the record that the defendant is waiving the presentation of mitigation knowingly, intelligently, and voluntarily. If the

58

circumstances present questions about the defendant's competence, the court should order an appropriate mental examination before accepting the waiver. These procedures will help ensure that waivers are made on an informed and voluntary basis and, by avoiding subsequent questions on these issues, also facilitate the review of any related capital sentences.

### J. Denial of Counsel's Motion to Withdraw

¶123 Hausner also argues that the trial court abused its discretion by denying his counsel's motion to withdraw after allowing him to waive the presentation of mitigation evidence. Defense counsel may move to withdraw in a criminal case if counsel believes that continued representation will or is likely to result in the violation of the Rules of Professional Conduct or other law. *See Rodriquez v. State,* 129 Ariz. 67, 70, 628 P.2d 950, 953 (1981) (discussing motion to withdraw based on violation of Disciplinary Rules); Ariz. Sup. Ct. R. 41, ER 1.16(a)(1), (c). We review a trial court's ruling on a motion to withdraw for abuse of discretion. *State v. Jones,* 185 Ariz. 471, 482, 917 P.2d 200, 211 (1996).

¶124 Hausner argues that, once he elected to waive the presentation of mitigation and to prevent his lawyers from arguing for leniency, the lawyers' continued representation violated Guideline 10.11(L) of the ABA Guidelines for the

Appointment of Defense Counsel in Death Penalty Cases (the "ABA Guidelines") and ER 1.16 of the Arizona Rules of Professional Conduct. The ABA guideline requires counsel to fully investigate mitigation and "to take advantage of all appropriate opportunities to argue why death is not suitable punishment." ER 1.16 provides that a lawyer shall withdraw if continued representation would result in a violation of law and may withdraw if the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement.

¶125    The ABA Guidelines are, under our Criminal Rules, guidelines and not requirements. By its terms, Criminal Rule 6.8(b)(1)(iii) states that trial counsel "shall be familiar with and guided by the performance standards" of the 2003 ABA Guidelines, and the 2006 comment to this Rule notes that "[s]ome guidelines may not be applicable to Arizona practice or to the circumstances of a particular case." Moreover, ER 1.16 does not mandate withdrawal any time continued representation may result in a violation of an ethical rule or other law; instead ER 1.16(c) provides that "[w]hen ordered to do so by a tribunal, a lawyer shall continue the representation notwithstanding good cause for terminating the representation."

¶126    Because Hausner was entitled to waive the presentation

of mitigation, his lawyers were ethically required to abide by that decision. *See* ER 1.2 (noting that a lawyer generally "shall abide by the client's decisions concerning the objectives of representation" and that, in criminal cases, the lawyer shall "abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify"). Hausner's decision to waive mitigation and to instruct his lawyers not to argue for a life sentence unquestionably put them in a difficult position and one they may have found morally repugnant. The trial court, however, did not abuse its discretion in denying their motion to withdraw.

## K. Review of Death Sentences

¶127 Because the murders occurred after August 1, 2002, this Court must review Hausner's death sentences to "determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13-756(A). A finding of an aggravating circumstance is not an abuse of discretion if there is "any reasonable evidence in the record to sustain it." *Morris,* 215 Ariz. at 341 ¶ 77, 160 P.3d at 220 (internal quotation omitted). The jury's determination that death is the appropriate sentence will not be reversed "so long as any reasonable jury could have concluded

61

that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Id.* ¶ 81.

### 1. Aggravating Circumstances

¶128 For reasons explained above, the jury did not abuse its discretion in finding the (F)(6) and (F)(13) aggravating factors with respect to victims Carillo, Ortis, Gutierrez-Cruz, and Blasnek. Sufficient evidence also exists to support the jury's finding of the (F)(1) (conviction for other offense subject to sentence of life imprisonment or death) and (F)(2) (prior conviction of a "serious offense") aggravators with respect to each of these victims and victims David Estrada and Nathanial Shoffner.

### 2. Mitigating Circumstances

¶129 Although Hausner did not present mitigation evidence during the penalty phase, evidence admitted at the guilt phase is admitted for purposes of the sentencing phase, A.R.S. § 13-752(I), and the jury must "consider the mitigating circumstances, whether proved by the defendant or present in the record, in determining whether death is the appropriate sentence." *State ex rel. Thomas v. Granville (Baldwin)*, 211 Ariz. 468, 473 ¶ 18, 123 P.3d 662, 667 (2005). The trial court properly instructed the jury that it must consider relevant mitigation presented at any phase of the trial.

¶130    Hausner contends that evidence at the guilt phase established that he was a caring father for his daughter, who was born in 2004, suffered from Von Gierke's disease, and required special care and feeding, and that he had two sons who died in 1994 at ages two and three in a car crash in which he was a passenger. He also states that he expressed sympathy for his victims at his post-arrest press conference and during allocution, that he had no felony convictions before this case, and that he was using methamphetamine daily when he committed the offenses and had overcome a prior addiction in 1994.

¶131    In response, the State notes that there was conflicting evidence about the degree of Hausner's concern for his daughter; that he had tried to exploit the tragedy of his sons' deaths by falsely testifying that he visited their gravesites one night of the shootings; that his remorse is entitled to little weight because he maintained his innocence; that the lack of prior convictions is not compelling given his many convictions in this case; and that he presented no evidence connecting his methamphetamine use to the crimes.

¶132    We will uphold a jury's decision to impose death if any "reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *Gallardo*, 225 Ariz. at 570 ¶ 52, 242 P.3d at 169.

63

In light of the several aggravating circumstances for each murder, and the limited mitigation, the jury did not abuse its discretion in imposing death sentences for the six murders.

### L. Sentencing on Non-Capital Counts

¶133    Hausner argues that the trial court committed fundamental error by enhancing several of his non-capital sentences under A.R.S. § 13-702.02 (2006) (since amended and renumbered A.R.S. § 13-703).  This statute provides for enhanced sentences for defendants who are convicted of multiple offenses committed on separate occasions but consolidated for trial.  Hausner contends that "[d]ue process and fundamental fairness under the Sixth and Fourteenth Amendments required the State to give notice that it intended to seek enhanced sentencing for the non-capital counts under A.R.S. § 13-702.02."

¶134    At the relevant time, A.R.S. § 13-702.02(G) stated:

> The court shall inform all of the parties before the sentencing occurs of its intent to increase or decrease the sentence pursuant to this section.  If the court fails to inform the parties, a party waives the right to be informed unless the party timely objects at the time of sentencing.

¶135    The State filed a sentencing memorandum asking the trial court to enhance the sentences on most of the non-capital counts under § 13-702.02.  Hausner did not object, and the trial court imposed enhanced sentences.  On appeal, Hausner acknowledges that this Court has never held that the state must

64

provide pretrial notice of its intent to seek enhanced sentences under this statute.

¶136    We need not decide whether the state must specifically provide notice before trial of its intent to seek an enhancement under § 13-702.02. Hausner in fact received notice. The consolidated trial indictment expressly alleged § 13-702.02 for certain animal cruelty charges. With respect to the charges more generally, the State filed notices of non-capital aggravating factors with respect to each cause number, stating: "[i]f the jury convicts the defendant of multiple felony counts that are not used to enhance the sentence under A.R.S. § 13-702.02 . . . the state intends to allege the multiple convictions as an aggravating circumstance."

¶137    No fundamental error occurred. The State indicated in its pretrial filings that it might seek enhanced sentences under A.R.S. § 13-702.02, and Hausner has not shown any prejudice from the lack of more specific notice. *Cf. State v. Tresize*, 127 Ariz. 571, 574, 623 P.2d 1, 4 (1980) (finding sufficient notice for enhancement for use of a deadly weapon or dangerous instrument based on allegations in indictment, although there was no separate allegation or statutory citation).

**CONCLUSION**

¶138    We reverse Hausner's conviction on count eight for animal cruelty and otherwise affirm his convictions and sentences.

¶139

_____
Scott Bales, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice


_____
*


* Before his resignation on June 27, 2012, as a result of his appointment to the United States Court of Appeals for the Ninth Circuit, Justice Andrew D. Hurwitz participated in this case, including oral argument, and concurred in this opinion's reasoning and result.

# APPENDIX

Hausner raises seventeen issues to preserve them for federal review. This Appendix lists his claims and the decisions he identifies as rejecting them.

1. The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Harrod*, 200 Ariz. 309, 320, 26 P.3d 492, 503 (2001).

2. The death penalty is irrational and imposed arbitrarily, and serves no other purpose that is not adequately addressed by life in prison, in violation of Hausner's due process under the Fourteenth Amendment to the U.S. Constitution and Article 2, §§ 1 and 4 of the Arizona Constitution. *State v. Smith*, 203 Ariz. 75, 82 ¶ 36, 50 P.3d 825, 832 (2002); *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988).

3. The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, §§ 1, 4 and 15 of the Arizona Constitution. *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds by Ring*, 536 U.S. at 584.

4. Proportionality review serves to identify which cases are above the norm of first degree murder, narrowing the class of defendants who are eligible for the death penalty. Thus, the absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Harrod*, 200 Ariz. at 320 ¶ 65, 26 P.3d at 503.

5. The State's failure to allege an element of a charged offense in the grand jury indictment – the aggravating factors under A.R.S. § 13-703(F) (renumbered as A.R.S. § 13-751(F), effective January 1, 2009) that made Defendant death eligible – is a fundamental defect that renders the indictment constitutionally defective under the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article 2, §§ 1, 4, 13, 15, 23 and 24 of the Arizona Constitution. *See U.S. v. Chesney*, 10 F.3d 641 (9th Cir. 1993); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

67

*See McKaney v. Foreman*, 209 Ariz. 268, 270-71 ¶¶ 11-13, 100 P.3d 18, 20-21 (2004).

6.  The (F)(6) aggravating factor of "especially cruel, heinous, or depraved" is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met, and the finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does not sufficiently place limits on the discretion of the sentencing body – the jury, which has no "narrowing construction[s]" to draw from and give "substance" to the otherwise facially vague law. *See Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other grounds by Ring,* 536 U.S. 584. *See also Chappell*, 225 Ariz. at 337-38 ¶¶ 26-27, 236 P.3d at 1184-85; *Hargrave,* 225 Ariz. at 13-14 ¶¶ 42-46, 234 P.3d at 581-82.

7.  The fact-finder in capital cases must be able to consider *all* relevant mitigating evidence in deciding whether to give the death penalty, *see Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), and the trial court's limitation of the jury to consideration of mitigation proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. *McGill*, 213 Ariz. at 161 ¶ 59, 140 P.3d at 944 (citing *Medina*, 193 Ariz. at 514-15 ¶ 43, 975 P.2d at 104-05).

8.  Arizona's capital sentencing scheme is unconstitutional because it does not require the State to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, or make specific findings as to mitigation. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *Roque,* 213 Ariz. at 225-26, ¶¶ 138-141, 141 P.3d at 400-401.

9.  Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion; aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty; and Arizona's death penalty statutes are unconstitutional because they provide no objective standards to guide the jury in weighing the aggravating and mitigating circumstances. Rather, the broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in

68

violation of the Fifth, Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. *State v. White,* 194 Ariz. 344, 355 § 49, 982 P.2d 819, 830 (1999).

10. Arizona's death penalty statutes lack standards necessary for the jury to find aggravation, to evaluate aggravation and the mitigation, and to determine what "sufficiently substantial to call for leniency" means, resulting in the arbitrary and capricious imposition of the death penalty in Arizona, in violation of Due Process, the Eighth and Fourteenth Amendments, as well as Ariz. Const. art. 2, § 15.925. *See Beaty*, 158 Ariz. at 247, 762 P.2d at 534.

11. Arizona's death penalty laws unconstitutionally require imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

12. The death penalty is the irreversible denial of human rights and the international community of nations has evolved to a state of maturity that abolishes the death penalty. Today, the majority of nations have abolished the death penalty. Amnesty International, *Facts and Figures on the Death Penalty* (January 1, 2006). The Universal Declaration of Human Rights, GA Res. 217A (III), U.N. GAOR, 3d Sess. Art. 3, U.N. Doc. A/810 (1948), provides that "Everyone has the right to life, liberty, and security of person." The death penalty thus violates the Universal Declaration of Human Rights, and is a violation of international law. *State v. Ross*, 180 Ariz. 598, 602, 886 P.2d 1354, 1358 (1994) (citing *State v. Richmond,* 136 Ariz. 312, 322, 666 P.2d 57, 67 (1983)).

13. Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, § 15 of the Arizona Constitution. Defendant acknowledges that this argument was rejected in *Van Adams*, 194 Ariz. at 422 ¶ 55, 984 P.2d at 30, and *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995). *See* Koniaris, et al., *Inadequate Anesthesia in Lethal Injection For Execution*, 365 Lancet 1412-14 (April 16, 2005) (suggesting that protocols for lethal injection are insufficient to assure painless death and evidence of botched executions).

14.	The penalty-phase jury instructions incorrectly told the jury that if the Defendant was not put to death, the judge could sentence him to a sentence of natural life or to life with release, and that this violated his constitutional due process rights under the Fifth and Fourteenth Amendments because there was no real possibility that Defendant would ever be released from prison.  *See Simmons v. South Carolina*, 512 U.S. 154 (1994)(reversible error to instruct jury that defendant could be released when he could not)*; Hargrave*, 225 Ariz. at 14-15 ¶¶ 50-53, 234 P.3d at 582-83.

15.	By allowing victim impact evidence at the penalty phase of trial, the trial court violated Defendant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, §§ 1, 4, 13, 15, 23 and 24 of the Arizona Constitution.  *Lynn v. Reinstein*, 205 Ariz. 186, 68 P.3d 412 (2003).

16.	The trial court improperly omitted from the penalty phase jury instructions words to the effect that they may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling them to assign whatever value the jury deemed appropriate and told the jury not to be influenced by sentiment, passion, or prejudice in determining these facts.  These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, § 1, 4, 15, 23, and 24 of the Arizona Constitution.  *State v. Carreon***,** 210 Ariz. 54, 70-72 ¶¶ 81-87, 107 P.3d 900, 916-18 (2005).  *See also State v. Kuhs*, 223 Ariz. 376, 386-87 ¶¶ 51-56, 224 P.3d 192, 202-03 (2010).

17.	The reasonable doubt instruction of *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995), dilutes and shifts the burden of proof in violation of the Sixth Amendment to the United States Constitution.  *State v. Ellison*, 213 Ariz. 116, 133 ¶ 63, 140 P.3d 899, 916 (2006).